(Slip Opinion)        OCTOBER  TERM,  2017        1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## JENNINGS ET AL. *v.* RODRIGUEZ ET AL., INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 15–1204.   Argued November 30, 2016—Reargued October 3, 2017—Decided February 27, 2018

Immigration officials are authorized to detain certain aliens in the course of immigration proceedings while they determine whether those aliens may be lawfully present in the country. For example, §1225(b) of Title 8 of the U. S. Code authorizes the detention of certain aliens seeking to enter the country. Section 1225(b)(1) applies to aliens initially determined to be inadmissible due to fraud, misrepresentation, or lack of valid documentation, and to certain other aliens designated by the Attorney General in his discretion. Section 1225(b)(2) is a catchall provision that applies to most other applicants for admission not covered by §1225(b)(1). Under §1225(b)(1), aliens are normally ordered removed "without further hearing or review," §1225(b)(1)(A)(i), but an alien indicating either an intention to apply for asylum or a credible fear of persecution, §1225(b)(1)(A)(ii), "shall be detained" while that alien's asylum application is pending, §1225(b)(1)(B)(ii). Aliens covered by §1225(b)(2) in turn "shall be detained for a [removal] proceeding" if an immigration officer "determines that [they are] not clearly and beyond a doubt entitled" to admission. §1225(b)(2)(A).

The Government is also authorized to detain certain aliens already in the country. Section 1226(a)'s default rule permits the Attorney General to issue warrants for the arrest and detention of these aliens pending the outcome of their removal proceedings. The Attorney General "may release" these aliens on bond, "[e]xcept as provided in subsection (c) of this section." Section 1226(c) in turn states that the Attorney General "shall take into custody any alien" who falls into one of the enumerated categories involving criminal offenses and ter-

rorist activities, §1226(c)(1), and specifies that the Attorney General "may release" one of those aliens "only if the Attorney General decides" both that doing so is necessary for witness-protection purposes and that the alien will not pose a danger or flight risk, §1226(c)(2).

After a 2004 conviction, respondent Alejandro Rodriguez, a Mexican citizen and a lawful permanent resident of the United States, was detained pursuant to §1226 while the Government sought to remove him. In May 2007, while still litigating his removal, Rodriguez filed a habeas petition, claiming that he was entitled to a bond hearing to determine whether his continued detention was justified. As relevant here, he and the class of aliens he represents allege that §§1225(b), 1226(a), and 1226(c) do not authorize "prolonged" detention in the absence of an individualized bond hearing at which the Government proves by clear and convincing evidence that detention remains justified. The District Court entered a permanent injunction, and the Ninth Circuit affirmed. Relying on the canon of constitutional avoidance, the Ninth Circuit construed §§1225(b) and 1226(c) as imposing an implicit 6-month time limit on an alien's detention under those sections. After that point, the court held, the Government may continue to detain the alien only under the authority of §1226(a). The court then construed §1226(a) to mean that an alien must be given a bond hearing every six months and that detention beyond the initial 6-month period is permitted only if the Government proves by clear and convincing evidence that further detention is justified.

*Held*: The judgment is reversed, and the case is remanded.

804 F. 3d 1060, reversed and remanded.

JUSTICE ALITO delivered the opinion of the Court, except as to Part II, concluding that §§1225(b), 1226(a), and 1226(c) do not give detained aliens the right to periodic bond hearings during the course of their detention. The Ninth Circuit misapplied the canon of constitutional avoidance in holding otherwise. Pp. 12–31.

(a) The canon of constitutional avoidance "comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one [plausible] construction." *Clark* v. *Martinez*, 543 U. S. 371, 385. The Ninth Circuit's interpretations of the provisions at issue, however, are implausible. Pp. 12–13.

(b) Read most naturally, §§1225(b)(1) and (b)(2) mandate detention of applicants for admission until certain proceedings have concluded. Until that point, nothing in the statutory text imposes a limit on the length of detention, and neither provision says anything about bond hearings. Pp. 13–19.

(1) Nothing in the text of §1225(b)(1) or §1225(b)(2) hints that

those provisions have an implicit 6-month time limit on the length of detention. Respondents must show that this is a plausible reading in order to prevail under the canon of constitutional avoidance, but they simply invoke the canon without making any attempt to defend their reading.

The Ninth Circuit also all but ignored the statutory text, relying instead on *Zadvydas* v. *Davis*, 533 U. S. 678, as authority for grafting a time limit onto §1225(b)'s text. There, this Court invoked the constitutional-avoidance canon, construing §1231(a)(6)—which provides than an alien subject to a removal order "may be detained" beyond the section's 90-day removal period—to mean that the alien may not be detained beyond "a period reasonably necessary to secure removal," *id.,* at 699, presumptively six months, *id.,* at 701. The Court detected ambiguity in the statutory phrase "may be detained" and noted the absence of any explicit statutory limit on the length of permissible detention following the entry of an order of removal.

Several material differences distinguish the provisions at issue in this case from *Zadvydas*'s interpretation of §1231(a)(6). To start, the provisions here, unlike §1231(a)(6), mandate detention for a specified period of time: until immigration officers have finished "consider[ing]" the asylum application, §1225(b)(1)(B)(ii), or until removal proceedings have concluded, §1225(b)(2)(A). Section 1231(a)(6) also uses the ambiguous "may," while §§1225(b)(1) and (b)(2) use the unequivocal mandate "shall be detained." There is also a specific provision authorizing temporary parole from §1225(b) detention "for urgent humanitarian reasons or significant public benefit," §1182(d)(5)(A), but no similar release provision applies to §1231(a)(6). That express exception implies that there are no other circumstances under which aliens detained under §1225(b) may be released. Pp. 14–17.

(2) Respondents also claim that the term "for" in §§1225(b)(1) and (b)(2) mandates detention only until the *start* of applicable proceedings. That is inconsistent with the meanings of "for"—"[d]uring [or] throughout," 6 Oxford English Dictionary 26, and "with the object or purpose of," *id.,* at 23—that make sense in the context of the statutory scheme as a whole. Nor does respondents' reading align with the historical use of "for" in §1225. Pp. 17–19.

(c) Section 1226(c)'s language is even clearer. By allowing aliens to be released "only if " the Attorney General decides that certain conditions are met, that provision reinforces the conclusion that aliens detained under its authority are not entitled to be released under any circumstances other than those expressly recognized by the statute. Together with §1226(a), §1226(c) makes clear that detention of aliens within its scope *must* continue "pending a decision" on removal. Sec-

tion 1226(c) is thus not silent as to the length of detention. See *Demore* v. *Kim*, 538 U. S. 510, 529. The provision, by expressly stating that covered aliens may be released "only if" certain conditions are met, also unequivocally imposes an affirmative *prohibition* on releasing them under any other conditions. Finally, because §1226(c) and the PATRIOT Act apply to different categories of aliens in different ways, adopting §1226(c)'s plain meaning will not make any part of the PATRIOT Act, see §1226a(a)(3), superfluous. Pp. 19–22.

(d) Nothing in §1226(a), which authorizes the Attorney General to arrest and detain an alien "pending a decision" on removal and which permits the Attorney General to release the alien on bond, supports the imposition of periodic bond hearings every six months in which the Attorney General must prove by clear and convincing evidence that continued detention is necessary. Nor does it hint that the length of detention prior to the bond hearing must be considered in determining whether an alien should be released. Pp. 22–23.

(e) The Ninth Circuit should consider the merits of respondents' constitutional arguments in the first instance. But before doing so, it should also reexamine whether respondents can continue litigating their claims as a class. Pp. 29–31.

ALITO, J., delivered the opinion of the Court, except as to Part II. ROBERTS, C. J., and KENNEDY, J., joined that opinion in full; THOMAS and GORSUCH, JJ., joined as to all but Part II; and SOTOMAYOR, J., joined as to Part III–C. THOMAS, J., filed an opinion concurring in part and concurring in the judgment, in which GORSUCH, J., joined except for footnote 6. BREYER, J., filed a dissenting opinion, in which GINSBURG and SOTOMAYOR, JJ., joined. KAGAN, J., took no part in the decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

————

No. 15–1204

————

## DAVID JENNINGS, ET AL., PETITIONERS *v.* ALEJANDRO RODRIGUEZ, ET AL., INDIVID- UALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[February 27, 2018]

JUSTICE ALITO delivered the opinion of the Court, except as to Part II.*

Every day, immigration officials must determine whether to admit or remove the many aliens who have arrived at an official "port of entry" (*e.g.,* an international airport or border crossing) or who have been apprehended trying to enter the country at an unauthorized location. Immigration officials must also determine on a daily basis whether there are grounds for removing any of the aliens who are already present inside the country. The vast majority of these determinations are quickly made, but in some cases deciding whether an alien should be admitted or removed is not as easy. As a result, Congress has authorized immigration officials to detain some classes of aliens during the course of certain immigration proceedings. Detention during those proceedings gives immigration officials time to determine an alien's status without running the risk of the alien's either absconding or engaging in criminal

————

*JUSTICE SOTOMAYOR joins only Part III–C of this opinion.

activity before a final decision can be made.

In this case we are asked to interpret three provisions of U. S. immigration law that authorize the Government to detain aliens in the course of immigration proceedings. All parties appear to agree that the text of these provisions, when read most naturally, does not give detained aliens the right to periodic bond hearings during the course of their detention. But by relying on the constitutional-avoidance canon of statutory interpretation, the Court of Appeals for the Ninth Circuit held that detained aliens have a statutory right to periodic bond hearings under the provisions at issue.

Under the constitutional-avoidance canon, when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems. But a court relying on that canon still must *interpret* the statute, not rewrite it. Because the Court of Appeals in this case adopted implausible constructions of the three immigration provisions at issue, we reverse its judgment and remand for further proceedings.

I

A

To implement its immigration policy, the Government must be able to decide (1) who may enter the country and (2) who may stay here after entering.

1

That process of decision generally begins at the Nation's borders and ports of entry, where the Government must determine whether an alien seeking to enter the country is admissible. Under 122 Stat. 867, 8 U. S. C. §1225, an alien who "arrives in the United States," or "is present" in this country but "has not been admitted," is treated as "an

applicant for admission." §1225(a)(1). Applicants for admission must "be inspected by immigration officers" to ensure that they may be admitted into the country consistent with U. S. immigration law. §1225(a)(3).

As relevant here, applicants for admission fall into one of two categories, those covered by §1225(b)(1) and those covered by §1225(b)(2). Section 1225(b)(1) applies to aliens initially determined to be inadmissible due to fraud, misrepresentation, or lack of valid documentation. See §1225(b)(1)(A)(i) (citing §§1182(a)(6)(C), (a)(7)). Section 1225(b)(1) also applies to certain other aliens designated by the Attorney General in his discretion. See §1225(b)(1)(A)(iii). Section 1225(b)(2) is broader. It serves as a catchall provision that applies to all applicants for admission not covered by §1225(b)(1) (with specific exceptions not relevant here). See §§1225(b)(2)(A), (B).

Both §1225(b)(1) and §1225(b)(2) authorize the detention of certain aliens. Aliens covered by §1225(b)(1) are normally ordered removed "without further hearing or review" pursuant to an expedited removal process. §1225(b)(1)(A)(i). But if a §1225(b)(1) alien "indicates either an intention to apply for asylum . . . or a fear of persecution," then that alien is referred for an asylum interview. §1225(b)(1)(A)(ii). If an immigration officer determines after that interview that the alien has a credible fear of persecution, "the alien shall be detained for further consideration of the application for asylum." §1225(b)(1)(B)(ii). Aliens who are instead covered by §1225(b)(2) are detained pursuant to a different process. Those aliens "shall be detained for a [removal] proceeding" if an immigration officer "determines that [they are] not clearly and beyond a doubt entitled to be admitted" into the country. §1225(b)(2)(A).

Regardless of which of those two sections authorizes their detention, applicants for admission may be temporarily released on parole "for urgent humanitarian reasons

or significant public benefit." §1182(d)(5)(A); see also 8 CFR §§212.5(b), 235.3 (2017). Such parole, however, "shall not be regarded as an admission of the alien." 8 U. S. C. §1182(d)(5)(A). Instead, when the purpose of the parole has been served, "the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." *Ibid.*

2

Even once inside the United States, aliens do not have an absolute right to remain here. For example, an alien present in the country may still be removed if he or she falls "within one or more . . . classes of deportable aliens." §1227(a). That includes aliens who were inadmissible at the time of entry or who have been convicted of certain criminal offenses since admission. See §§1227(a)(1), (2).

Section 1226 generally governs the process of arresting and detaining that group of aliens pending their removal. As relevant here, §1226 distinguishes between two different categories of aliens. Section 1226(a) sets out the default rule: The Attorney General may issue a warrant for the arrest and detention of an alien "pending a decision on whether the alien is to be removed from the United States." §1226(a). "Except as provided in subsection (c) of this section," the Attorney General "may release" an alien detained under §1226(a) "on bond . . . or conditional parole." *Ibid.*

Section 1226(c), however, carves out a statutory category of aliens who may *not* be released under §1226(a). Under §1226(c), the "Attorney General shall take into custody any alien" who falls into one of several enumerated categories involving criminal offenses and terrorist activities. §1226(c)(1). The Attorney General may release aliens in those categories "only if the Attorney General decides . . .

that release of the alien from custody is necessary" for witness-protection purposes and "the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding." §1226(c)(2). Any release under those narrow conditions "shall take place in accordance with a procedure that considers the severity of the offense committed by the alien." *Ibid.*[1]

In sum, U. S. immigration law authorizes the Government to detain certain aliens seeking admission into the country under §§1225(b)(1) and (b)(2). It also authorizes the Government to detain certain aliens already in the country pending the outcome of removal proceedings under §§1226(a) and (c). The primary issue is the proper interpretation of §§1225(b), 1226(a), and 1226(c).

## B

Respondent Alejandro Rodriguez is a Mexican citizen. Since 1987, he has also been a lawful permanent resident of the United States. In April 2004, after Rodriguez was convicted of a drug offense and theft of a vehicle, the Government detained him under §1226 and sought to remove him from the country. At his removal hearing, Rodriguez argued both that he was not removable and, in the alternative, that he was eligible for relief from removal. In July 2004, an Immigration Judge ordered Rodriguez deported to Mexico. Rodriguez chose to appeal that decision to the Board of Immigration Appeals, but five months

---

[1] Anyone who believes that he is not covered by §1226(c) may also ask for what is known as a "*Joseph* hearing." See *Matter of Joseph*, 22 I. & N. Dec. 799 (BIA 1999). At a *Joseph* hearing, that person "may avoid mandatory detention by demonstrating that he is not an alien, was not convicted of the predicate crime, or that the [Government] is otherwise substantially unlikely to establish that he is in fact subject to mandatory detention." *Demore* v. *Kim*, 538 U. S. 510, 514, n. 3 (2003). Whether respondents are entitled to *Joseph* hearings is not before this Court.

later the Board agreed that Rodriguez was subject to mandatory removal. Once again, Rodriguez chose to seek further review, this time petitioning the Court of Appeals for the Ninth Circuit for review of the Board's decision.

In May 2007, while Rodriguez was still litigating his removal in the Court of Appeals, he filed a habeas petition in the District Court for the Central District of California, alleging that he was entitled to a bond hearing to determine whether his continued detention was justified. Rodriguez's case was consolidated with another, similar case brought by Alejandro Garcia, and together they moved for class certification. The District Court denied their motion, but the Court of Appeals for the Ninth Circuit reversed. See *Rodriguez* v. *Hayes*, 591 F. 3d 1105, 1111 (2010). It concluded that the proposed class met the certification requirements of Rule 23 of the Federal Rules of Civil Procedure, and it remanded the case to the District Court. *Id.,* at 1111, 1126.

On remand, the District Court certified the following class:

> "[A]ll non-citizens within the Central District of California who: (1) are or were detained for longer than six months pursuant to one of the general immigration detention statutes pending completion of removal proceedings, including judicial review, (2) are not and have not been detained pursuant to a national security detention statute, and (3) have not been afforded a hearing to determine whether their detention is justified." Class Certification Order in *Rodriguez* v. *Hayes*, CV 07–03239 (CD Cal., Apr. 5, 2010).

The District Court named Rodriguez as class representative of the newly certified class, *ibid.*, and then organized the class into four subclasses based on the four "general immigration detention statutes" under which it understood the class members to be detained: Sections 1225(b),

1226(a), 1226(c), and 1231(a).  See Order Granting Plaintiff's Motion for Class Certification in *Rodriguez* v. *Holder*, CV 07–03239 (CD Cal., Mar. 8, 2011) (2011 Order); *Rodriguez* v. *Robbins*, 715 F. 3d 1127, 1130–1131 (CA9 2013). Each of the four subclasses was certified to pursue declaratory and injunctive relief.  2011 Order.  On appeal, the Court of Appeals held that the §1231(a) subclass had been improperly certified, but it affirmed the certification of the other three subclasses.  See *Rodriguez* v. *Robbins*, 804 F. 3d 1060, 1074, 1085–1086 (CA9 2015).

In their complaint, Rodriguez and the other respondents argued that the relevant statutory provisions—§§1225(b), 1226(a), and 1226(c)—do not authorize "prolonged" detention in the absence of an individualized bond hearing at which the Government proves by clear and convincing evidence that the class member's detention remains justified.  Absent such a bond-hearing requirement, respondents continued, those three provisions would violate the Due Process Clause of the Fifth Amendment.  In their prayer for relief, respondents thus asked the District Court to require the Government "to provide, after giving notice, individual hearings before an immigration judge for . . . each member of the class, at which [the Government] will bear the burden to prove by clear and convincing evidence that no reasonable conditions will ensure the detainee's presence in the event of removal and protect the community from serious danger, despite the prolonged length of detention at issue."  Third Amended Complaint in *Rodriguez* v. *Holder*, CV 07–03239, p. 31 (CD Cal., Oct. 20, 2010).  Respondents also sought declaratory relief. *Ibid.*

As relevant here, the District Court entered a permanent injunction in line with the relief sought by respondents, and the Court of Appeals affirmed.  See 804 F. 3d*,* at 1065.  Relying heavily on the canon of constitutional avoidance, the Court of Appeals construed §§1225(b) and

1226(c) as imposing an implicit 6-month time limit on an alien's detention under these sections. *Id.,* at 1079, 1082. After that point, the Court of Appeals held, the Government may continue to detain the alien only under the authority of §1226(a). *Ibid.* The Court of Appeals then construed §1226(a) to mean that an alien must be given a bond hearing every six months and that detention beyond the initial 6-month period is permitted only if the Government proves by clear and convincing evidence that further detention is justified. *Id.,* at 1085, 1087.

The Government petitioned this Court for review of that decision, and we granted certiorari. 579 U. S. ___ (2016).

## II

Before reaching the merits of the lower court's interpretation, we briefly address whether we have jurisdiction to entertain respondents' claims. We discuss two potential obstacles, 8 U. S. C. §§1252(b)(9) and 1226(e).

## A

Under §1252(b)(9):

> "Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter [including §§1225 and 1226] shall be available only in judicial review of a final order under this section."

This provision does not deprive us of jurisdiction. We are required in this case to decide "questions of law," specifically, whether, contrary to the decision of the Court of Appeals, certain statutory provisions require detention without a bond hearing. We assume for the sake of argument that the actions taken with respect to all the aliens in the certified class constitute "action[s] taken . . . to

remove [them] from the United States."[2]  On that assumption, the applicability of §1252(b)(9) turns on whether the legal questions that we must decide "aris[e] from" the actions taken to remove these aliens.

It may be argued that this is so in the sense that if those actions had never been taken, the aliens would not be in custody at all.  But this expansive interpretation of §1252(b)(9) would lead to staggering results.  Suppose, for example, that a detained alien wishes to assert a claim under *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971), based on allegedly inhumane conditions of confinement.  See, *e.g., Ziglar* v. *Abbasi*, 582 U. S. ___, ___–___ (2017) (slip op., at 23–29).  Or suppose that a detained alien brings a state-law claim for assault against a guard or fellow detainee.  Or suppose that an alien is injured when a truck hits the bus transporting aliens to a detention facility, and the alien sues the driver or owner of the truck.  The "questions of law and fact" in all those cases could be said to "aris[e] from" actions taken to remove the aliens in the sense that the aliens' injuries would never have occurred if they had not been placed in detention.  But cramming judicial review of those questions into the review of final removal orders would be absurd.

Interpreting "arising from" in this extreme way would also make claims of prolonged detention effectively unreviewable.  By the time a final order of removal was eventually entered, the allegedly excessive detention would have already taken place.  And of course, it is possible that no such order would ever be entered in a particular case, depriving that detainee of any meaningful chance for judicial review.

In past cases, when confronted with capacious phrases

——————

[2] It is questionable whether this is true for aliens who are detained under 8 U. S. C. §1225(b)(1)(B)(ii) for consideration of their asylum applications.

like "'arising from,'" we have eschewed "'uncritical literal-
ism'" leading to results that "'no sensible person could
have intended.'"   *Gobeille* v. *Liberty Mut. Ins. Co.*, 577
U. S. ___, ___ (2016) (slip op., at 6) (interpreting phrase
"relate to" in the Employee Retirement Income Security
Act of 1974's pre-emption provision).   See also, *e.g., FERC*
v. *Electric Power Supply Assn.*, 577 U. S. ___, ___–___
(2016) (slip op., at 15–16) (interpreting term "affecting" in
Federal Power Act); *Maracich* v. *Spears*, 570 U. S. 48, 59–
61 (2013) (interpreting phrase "in connection with" in
Driver's Privacy Protection Act); *Dan's City Used Cars,
Inc.* v. *Pelkey*, 569 U. S. 251, 260–261 (2013) (interpreting
phrase "related to" in Federal Aviation Administration
Authorization Act); *Celotex Corp.* v. *Edwards*, 514 U. S.
300, 308 (1995) (interpreting phrase "related to" in
Bankruptcy Act).   In *Reno* v. *American-Arab Anti-
Discrimination Comm.*, 525 U. S. 471, 482 (1999), we took
this approach in construing the very phrase that appears
in §1252(b)(9).   A neighboring provision of the Immigra-
tion and Nationality Act refers to "any cause or claim by or
on behalf of any alien *arising from* the decision or action
by the Attorney General to commence proceedings, adjudi-
cate cases, or execute removal orders against any alien
under this chapter."   8 U. S. C. §1252(g) (emphasis added).
We did not interpret this language to sweep in any claim
that can technically be said to "arise from" the three listed
actions of the Attorney General.   Instead, we read the
language to refer to just those three specific actions them-
selves.   *American-Arab Anti-Discrimination Comm.*, *su-
pra*, at 482–483.

   The parties in this case have not addressed the scope of
§1252(b)(9), and it is not necessary for us to attempt to
provide a comprehensive interpretation.   For present
purposes, it is enough to note that respondents are not
asking for review of an order of removal; they are not
challenging the decision to detain them in the first place

or to seek removal; and they are not even challenging any part of the process by which their removability will be determined. Under these circumstances, §1252(b)(9) does not present a jurisdictional bar.[3]

## B

We likewise hold that §1226(e) does not bar us from considering respondents' claims.

That provision states:

"The Attorney General's discretionary judgment regarding the application of [§1226] shall not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole." §1226(e).

As we have previously explained, §1226(e) precludes an alien from "challeng[ing] a 'discretionary judgment' by the Attorney General or a 'decision' that the Attorney General has made regarding his detention or release." *Demore* v. *Kim*, 538 U. S. 510, 516 (2003). But §1226(e) does not preclude "challenges [to] the statutory framework that permits [the alien's] detention without bail." *Id.,* at 517.

Respondents mount that second type of challenge here.

─────────

[3] The concurrence contends that "detention *is* an 'action taken . . . to remove' an alien" and that therefore "even the narrowest reading of 'arising from' must cover" the claims raised by respondents. *Post,* at 6. We do not follow this logic. We will assume for the sake of argument that detention is an action taken "to remove an alien," *i.e.*, for the purpose of removing an alien, rather than simply an action aimed at ensuring that the alien does not flee or commit a crime while his proceedings are pending. But even if we proceed on the basis of that assumption, we do not see what it proves. The question is not whether *detention* is an action taken to remove an alien but whether *the legal questions* in this case arise from such an action. And for the reasons explained above, those legal questions are too remote from the actions taken to fall within the scope of §1252(b)(9).

First and foremost, they are challenging the extent of the Government's detention authority under the "statutory framework" as a whole.  If that challenge fails, they are then contesting the constitutionality of the entire statutory scheme under the Fifth Amendment.  Because the extent of the Government's detention authority is not a matter of "discretionary judgment," "action," or "decision," respondents' challenge to "the statutory framework that permits [their] detention without bail," *ibid.*, falls outside of the scope of §1226(e).  We may therefore consider the merits of their claims.

## III

When "a serious doubt" is raised about the constitutionality of an act of Congress, "it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided."  *Crowell* v. *Benson*, 285 U. S. 22, 62 (1932).  Relying on this canon of constitutional avoidance, the Court of Appeals construed §§1225(b), 1226(a), and 1226(c) to limit the permissible length of an alien's detention without a bond hearing.  Without such a construction, the Court of Appeals believed, the "'prolonged detention without adequate procedural protections'" authorized by the provisions "'would raise serious constitutional concerns.'"  804 F. 3d, at 1077 (quoting *Casas-Castrillon* v. *DHS*, 535 F. 3d 942, 950 (CA9 2008)).

The canon of constitutional avoidance "comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction."  *Clark* v. *Martinez*, 543 U. S. 371, 385 (2005).  In the absence of more than one plausible construction, the canon simply "'has no application.'"  *Warger* v. *Shauers*, 574 U. S. ___, ___ (2014) (slip op., at 10) (quoting *United States* v. *Oakland Cannabis Buyers' Cooperative*, 532 U. S. 483, 494 (2001)).

The Court of Appeals misapplied the canon in this case because its interpretations of the three provisions at issue here are implausible. In Parts III–A and III–B, we hold that, subject only to express exceptions, §§1225(b) and 1226(c) authorize detention until the end of applicable proceedings. And in Part III–C, we hold that there is no justification for any of the procedural requirements that the Court of Appeals layered onto §1226(a) without any arguable statutory foundation.

A

As noted, §1225(b) applies primarily to aliens seeking entry into the United States ("applicants for admission" in the language of the statute). Section 1225(b) divides these applicants into two categories. First, certain aliens claiming a credible fear of persecution under §1225(b)(1) "shall be detained for further consideration of the application for asylum." §1225(b)(1)(B)(ii). Second, aliens falling within the scope of §1225(b)(2) "shall be detained for a [removal] proceeding." §1225(b)(2)(A).

Read most naturally, §§1225(b)(1) and (b)(2) thus mandate detention of applicants for admission until certain proceedings have concluded. Section 1225(b)(1) aliens are detained for "further consideration of the application for asylum," and §1225(b)(2) aliens are in turn detained for "[removal] proceeding[s]." Once those proceedings end, detention under §1225(b) must end as well. Until that point, however, nothing in the statutory text imposes any limit on the length of detention. And neither §1225(b)(1) nor §1225(b)(2) says anything whatsoever about bond hearings.

Despite the clear language of §§1225(b)(1) and (b)(2), respondents argue—and the Court of Appeals held—that those provisions nevertheless can be construed to contain implicit limitations on the length of detention. But neither of the two limiting interpretations offered by re-

spondents is plausible.

1

First, respondents argue that §§1225(b)(1) and (b)(2) contain an implicit 6-month limit on the length of detention. Once that 6-month period elapses, respondents contend, aliens previously detained under those provisions must instead be detained under the authority of §1226(a), which allows for bond hearings in certain circumstances.

There are many problems with this interpretation. Nothing in the text of §1225(b)(1) or §1225(b)(2) even hints that those provisions restrict detention after six months, but respondents do not engage in any analysis of the text. Instead, they simply cite the canon of constitutional avoidance and urge this Court to use that canon to read a "six-month reasonableness limitation" into §1225(b). Brief for Respondents 48.

That is not how the canon of constitutional avoidance works. Spotting a constitutional issue does not give a court the authority to rewrite a statute as it pleases. Instead, the canon permits a court to "choos[e] between competing *plausible* interpretations of a statutory text." *Clark*, *supra*, at 381 (emphasis added). To prevail, respondents must thus show that §1225(b)'s detention provisions may plausibly be read to contain an implicit 6-month limit. And they do not even attempt to defend that reading of the text.

In much the same manner, the Court of Appeals all but ignored the statutory text. Instead, it read *Zadvydas* v. *Davis*, 533 U. S. 678 (2001), as essentially granting a license to graft a time limit onto the text of §1225(b). *Zadvydas,* however, provides no such authority.

*Zadvydas* concerned §1231(a)(6), which authorizes the detention of aliens who have already been ordered removed from the country. Under this section, when an alien is ordered removed, the Attorney General is directed

to complete removal within a period of 90 days, 8 U. S. C. §1231(a)(1)(A), and the alien must be detained during that period, §1231(a)(2). After that time elapses, however, §1231(a)(6) provides only that certain aliens "*may* be detained" while efforts to complete removal continue. (Emphasis added.)

In *Zadvydas*, the Court construed §1231(a)(6) to mean that an alien who has been ordered removed may not be detained beyond "a period reasonably necessary to secure removal," 533 U. S., at 699, and it further held that six months is a presumptively reasonable period, *id.,* at 701. After that, the Court concluded, if the alien "provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future," the Government must either rebut that showing or release the alien. *Ibid.*

The *Zadvydas* Court justified this interpretation by invoking the constitutional-avoidance canon, and the Court defended its resort to that canon on the ground that §1231(a)(6) is ambiguous. Specifically, the Court detected ambiguity in the statutory phrase "*may* be detained." "'[M]ay,'" the Court said, "suggests discretion" but not necessarily "unlimited discretion. In that respect the word 'may' is ambiguous." *Id.,* at 697. The Court also pointed to the absence of any explicit statutory limit on the length of permissible detention following the entry of an order of removal. *Ibid.*

*Zadvydas* represents a notably generous application of the constitutional-avoidance canon, but the Court of Appeals in this case went much further. It failed to address whether *Zadvydas*'s reasoning may fairly be applied in this case despite the many ways in which the provision in question in *Zadvydas*, §1231(a)(6), differs materially from those at issue here, §§1225(b)(1) and (b)(2). Those differences preclude the reading adopted by the Court of Appeals.

To start, §§1225(b)(1) and (b)(2), unlike §1231(a)(6), provide for detention for a specified period of time. Section 1225(b)(1) mandates detention "for further consideration of the application for asylum," §1225(b)(1)(B)(ii), and §1225(b)(2) requires detention "for a [removal] proceeding," §1225(b)(2)(A). The plain meaning of those phrases is that detention must continue until immigration officers have finished "consider[ing]" the application for asylum, §1225(b)(1)(B)(ii), or until removal proceedings have concluded, §1225(b)(2)(A). By contrast, Congress left the permissible length of detention under §1231(a)(6) unclear.

Moreover, in *Zadvydas,* the Court saw ambiguity in §1231(a)(6)'s use of the word "may." Here, by contrast, §§1225(b)(1) and (b)(2) do not use the word "may." Instead, they unequivocally mandate that aliens falling within their scope "shall" be detained. "Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement." *Kingdomware Technologies, Inc.* v. *United States*, 579 U. S. ___, ___ (2016) (slip op., at 9). That requirement of detention precludes a court from finding ambiguity here in the way that *Zadvydas* found ambiguity in §1231(a)(6).

*Zadvydas*'s reasoning is particularly inapt here because there is a specific provision authorizing release from §1225(b) detention whereas no similar release provision applies to §1231(a)(6). With a few exceptions not relevant here, the Attorney General may "for urgent humanitarian reasons or significant public benefit" temporarily parole aliens detained under §§1225(b)(1) and (b)(2). 8 U. S. C. §1182(d)(5)(A). That express exception to detention implies that there are no *other* circumstances under which aliens detained under §1225(b) may be released. See A. Scalia & B. Garner, Reading Law 107 (2012) ("Negative-Implication Canon[:] The expression of one thing implies the exclusion of others (*expressio unius est exclusio alterius*)"). That negative implication precludes the sort of

implicit time limit on detention that we found in *Zadvydas*.[4]

In short, a series of textual signals distinguishes the provisions at issue in this case from *Zadvydas*'s interpretation of §1231(a)(6). While *Zadvydas* found §1231(a)(6) to be ambiguous, the same cannot be said of §§1225(b)(1) and (b)(2): Both provisions mandate detention until a certain point and authorize release prior to that point only under limited circumstances. As a result, neither provision can reasonably be read to limit detention to six months.

2

In this Court, respondents advance an interpretation of the language of §§1225(b)(1) and (b)(2) that was never made below, namely, that the term "for," which appears in both provisions, mandates detention only until the *start* of applicable proceedings rather than all the way through to their conclusion. Respondents contrast the language of §§1225(b)(1) and (b)(2) authorizing detention "for" further proceedings with another provision's authorization of detention "pending" further proceedings. See 8 U. S. C. §1225(b)(1)(B)(iii)(IV) ("Any alien . . . shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed"). According to respondents, that distinction between "for" and "pending" makes an enormous difference. As they see things, the word "pending" authorizes detention throughout subsequent proceedings, but the term "for" means that detention authority ends once subsequent proceedings

———————

[4] According to the dissent, we could have applied the *expressio unius* canon in *Zadvydas* as well because there was also an "alternative avenue for relief, namely, bail," available for aliens detained under §1231(a)(6). *Post,* at 25 (opinion of BREYER, J.). But the dissent overlooks the fact that the provision granting bail was precisely the same provision that the Court purported to be interpreting, so the canon was not applicable. See 533 U. S., at 683.

begin. As a result, respondents argue, once the applicable proceedings commence, §§1225(b)(1) and (b)(2) no longer authorize detention, and the Government must instead look to §1226(a) for continued detention authority.

That interpretation is inconsistent with ordinary English usage and is incompatible with the rest of the statute. To be sure, "for" can sometimes mean "in preparation for or anticipation of." 6 Oxford English Dictionary 24 (2d ed. 1989). But "for" can also mean "[d]uring [or] throughout," *id.,* at 26, as well as "with the object or purpose of," *id.,* at 23; see also American Heritage Dictionary 709 (3d ed. 1992) ("Used to indicate the object, aim, or purpose of an action or activity"; "Used to indicate amount, extent, or duration"); Random House Dictionary of the English Language 747 (2d ed. 1987) ("with the object or purpose of"; "during the continuance of"); Webster's Third New International Dictionary 886 (1993) ("with the purpose or object of"; "to the . . . duration of"). And here, only that second set of definitions makes sense in the context of the statutory scheme as a whole.

For example, respondents argue that, once detention authority ends under §§1225(b)(1) and (b)(2), aliens can be detained only under §1226(a). But that section authorizes detention only "[o]n a warrant issued" by the Attorney General leading to the alien's arrest. §1226(a). If respondents' interpretation of §1225(b) were correct, then the Government could detain an alien without a warrant at the border, but once removal proceedings began, the Attorney General would have to issue an arrest warrant in order to continue detaining the alien. To put it lightly, that makes little sense.

Nor does respondents' interpretation of the word "for" align with the way Congress has historically used that word in §1225. Consider that section's text prior to the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, 110 Stat. 3009–546.

Under the older version of §1225(b), "[e]very alien" within its scope "who may not appear . . . to be clearly and beyond a doubt entitled to [entry] shall be detained for further inquiry to be conducted by a special inquiry officer." 8 U. S. C. §1225(b) (1994 ed.). It would make no sense to read "for further inquiry" as authorizing detention of the alien only until the start of the inquiry; Congress obviously did not mean to allow aliens to feel free to leave once immigration officers asked their first question.

In sum, §§1225(b)(1) and (b)(2) mandate detention of aliens throughout the completion of applicable proceedings and not just until the moment those proceedings begin. Of course, other provisions of the immigration statutes do authorize detention "pending" other proceedings or "until" a certain point. See *post,* at 22–23 (BREYER, J., dissenting) (quoting §1225(b)(1)(B)(iii)(IV)). But there is no "canon of interpretation that forbids interpreting different words used in different parts of the same statute to mean roughly the same thing." *Kirtsaeng* v. *John Wiley & Sons, Inc.,* 568 U. S. 519, 540 (2013). We decline to invent and apply such a canon here.

B

While the language of §§1225(b)(1) and (b)(2) is quite clear, §1226(c) is even clearer. As noted, §1226 applies to aliens already present in the United States. Section 1226(a) creates a default rule for those aliens by permitting—but not requiring—the Attorney General to issue warrants for their arrest and detention pending removal proceedings. Section 1226(a) also permits the Attorney General to release those aliens on bond, "[e]xcept as provided in subsection (c) of this section." Section 1226(c) in turn states that the Attorney General "shall take into custody any alien" who falls into one of the enumerated categories involving criminal offenses and terrorist activities. 8 U. S. C. §1226(c)(1). Section 1226(c) then goes on

to specify that the Attorney General "may release" one of those aliens "*only if* the Attorney General decides" both that doing so is necessary for witness-protection purposes and that the alien will not pose a danger or flight risk. §1226(c)(2) (emphasis added).

Like §1225(b), §1226(c) does not on its face limit the length of the detention it authorizes. In fact, by allowing aliens to be released "only if" the Attorney General decides that certain conditions are met, §1226(c) reinforces the conclusion that aliens detained under its authority are not entitled to be released under any circumstances other than those expressly recognized by the statute. And together with §1226(a), §1226(c) makes clear that detention of aliens within its scope *must* continue "pending a decision on whether the alien is to be removed from the United States." §1226(a).

In a reprise of their interpretation of §1225(b), respondents argue, and the Court of Appeals held, that §1226(c) should be interpreted to include an implicit 6-month time limit on the length of mandatory detention. Once again, that interpretation falls far short of a "plausible statutory construction."

In defense of their statutory reading, respondents first argue that §1226(c)'s "silence" as to the length of detention "cannot be construed to authorize prolonged mandatory detention, because Congress must use 'clearer terms' to authorize 'long-term detention.'" Brief for Respondents 34 (quoting *Zadvydas*, 533 U. S., at 697). But §1226(c) is *not* "silent" as to the length of detention. It mandates detention "pending a decision on whether the alien is to be removed from the United States," §1226(a), and it expressly prohibits release from that detention except for narrow, witness-protection purposes. Even if courts were permitted to fashion 6-month time limits out of statutory silence, they certainly may not transmute existing statutory language into its polar opposite. The constitutional-

avoidance canon does not countenance such textual alchemy.

Indeed, we have held as much in connection with §1226(c) itself. In *Demore* v. *Kim*, 538 U. S., at 529, we distinguished §1226(c) from the statutory provision in *Zadvydas* by pointing out that detention under §1226(c) has "a definite termination point": the conclusion of re- moval proceedings. As we made clear there, that "definite termination point"—and not some arbitrary time limit devised by courts—marks the end of the Government's detention authority under §1226(c).

Respondents next contend that §1226(c)'s limited au- thorization for release for witness-protection purposes does not imply that other forms of release are forbidden, but this argument defies the statutory text. By expressly stating that the covered aliens may be released "only if" certain conditions are met, 8 U. S. C. §1226(c)(2), the statute expressly and unequivocally imposes an affirma- tive *prohibition* on releasing detained aliens under any other conditions.

Finally, respondents point to a provision enacted as part of the PATRIOT Act[5] and contend that their reading of §1226(c) is needed to prevent that provision from being superfluous. That argument, however, misreads both statutory provisions. Although the two provisions overlap in part, they are by no means congruent.

Two differences stand out. First, §1226(c) and the PATRIOT Act cover different categories of aliens. Both apply to certain terrorist suspects, but only §1226(c) reaches aliens convicted of other more common criminal offenses. See §§1226(c)(1)(A)–(C) (aliens inadmissible or deportable under §1182(a)(2); §§1227(a)(2)(A)(ii), (A)(iii),

---

[5] See Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (PATRIOT Act), 115 Stat. 272.

(B), (C), and (D); and §1227(a)(2)(A)(i) under certain conditions). For its part, the PATRIOT Act casts a wider net than §1226(c) insofar as it encompasses certain threats to national security not covered by §1226(c). See §1226a(a)(3) (aliens described in §§1182(a)(3)(A)(i), (iii), and 1227(a)(4)(A)(i), (iii), as well as aliens "engaged in any other activity that endangers the national security of the United States"). In addition, the Government's detention authority under §1226(c) and the PATRIOT Act is not the same. Under §1226(c), the Government must detain an alien until "a decision on *whether* the alien is to be removed" is made. §1226(a) (emphasis added). But, subject to exceptions not relevant here, the PATRIOT Act authorizes the Government to detain an alien "until the alien *is removed.*" §1226a(a)(2) (emphasis added).

Far from being redundant, then, §1226(c) and the PATRIOT Act apply to different categories of aliens in different ways. There is thus no reason to depart from the plain meaning of §1226(c) in order to avoid making the provision superfluous.

We hold that §1226(c) mandates detention of any alien falling within its scope and that detention may end prior to the conclusion of removal proceedings "only if" the alien is released for witness-protection purposes.

C

Finally, as noted, §1226(a) authorizes the Attorney General to arrest and detain an alien "pending a decision on whether the alien is to be removed from the United States." §1226(a). As long as the detained alien is not covered by §1226(c), the Attorney General "may release" the alien on "bond . . . or conditional parole." §1226(a). Federal regulations provide that aliens detained under §1226(a) receive bond hearings at the outset of detention. See 8 CFR §§236.1(d)(1), 1236.1(d)(1).

The Court of Appeals ordered the Government to pro-

vide procedural protections that go well beyond the initial bond hearing established by existing regulations—namely, periodic bond hearings every six months in which the Attorney General must prove by clear and convincing evidence that the alien's continued detention is necessary. Nothing in §1226(a)'s text—which says only that the Attorney General "may release" the alien "on . . . bond"— even remotely supports the imposition of either of those requirements. Nor does §1226(a)'s text even hint that the length of detention prior to a bond hearing must specifically be considered in determining whether the alien should be released.

IV

For these reasons, the meaning of the relevant statutory provisions is clear—and clearly contrary to the decision of the Court of Appeals. But the dissent is undeterred. It begins by ignoring the statutory language for as long as possible, devoting the first two-thirds of its opinion to a disquisition on the Constitution. Only after a 19-page prologue does the dissent acknowledge the relevant statutory provisions.

The dissent frames the question of interpretation as follows: Can §§1225(b), 1226(c), and 1226(a) be read to require bond hearings every six months "without doing violence to the statutory language," *post,* at 20 (opinion of BREYER, J.)? According to the dissent, the answer is "yes," but the dissent evidently has a strong stomach when it comes to inflicting linguistic trauma. Thus, when Congress mandated that an "alien shall be detained," §1225(b)(1)(B)(ii), what Congress really meant, the dissent insists, is that the alien may be released from custody provided only that his freedom of movement is restricted in some way, such as by "the imposition of a curfew," *post,* at 21. And when Congress stressed that "[t]he Attorney General may release an alien . . . *only if . . .* release . . .

from custody is necessary" to protect the safety of a witness, §1226(c)(2) (emphasis added), what Congress meant, the dissent tells us, is that the Attorney General must release an alien even when no witness is in need of protection—so long as the alien is neither a flight risk nor a danger to the community, see *post,* at 25–27. The contortions needed to reach these remarkable conclusions are a sight to behold.

Let us start with the simple term "detain." According to the dissent, "detain" means the absence of "unrestrained freedom." *Post,* at 21. An alien who is subject to any one of "numerous restraints"—including "a requirement to obtain medical treatment," "to report at regular intervals," or even simply to comply with "a curfew"—is "detained" in the dissent's eyes, even if that alien is otherwise free to roam the streets. *Ibid.*

This interpretation defies ordinary English usage. The dictionary cited by the dissent, the Oxford English Dictionary (OED), defines "detain" as follows: "[t]o keep in confinement or under restraint; *to keep prisoner*." 4 OED 543 (2d ed. 1989) (emphasis added); see also OED (3d ed. 2012), http://www.oed.com/view/Entry/51176 (same). Other general-purpose dictionaries provide similar definitions. See, *e.g.,* Webster's Third New International Dictionary 616 (1961) ("to hold or keep in or as if in custody <~*ed* by the police for questioning>"); Webster's New International Dictionary 710 (2d ed. 1934) ("[t]o hold or keep as in custody"); American Heritage Dictionary 508 (def. 2) (3d ed. 1992) ("To keep in custody or temporary confinement"); Webster's New World College Dictionary 375 (3d ed. 1997) ("to keep in custody; confine"). And legal dictionaries define "detain" the same way. See, *e.g.,* Ballentine's Law Dictionary 343 (3d ed. 1969) ("To hold; to keep in custody; to keep"); Black's Law Dictionary 459 (7th ed. 1999) ("The act or fact of holding a person in custody; confinement or compulsory delay").

How does the dissent attempt to evade the clear meaning of "detain"? It resorts to the legal equivalent of a sleight-of-hand trick. First, the dissent cites a passage in Blackstone stating that arrestees could always seek release on bail. *Post,* at 8–9. Then, having established the obvious point that a person who is initially detained may later be released from detention, the dissent reasons that this means that a person may still be regarded as detained even after he is released from custody. *Post,* at 21. That, of course, is a nonsequitur. Just because a person who is initially detained may later be released, it does not follow that the person is still "detained" after his period of detention comes to an end.

If there were any doubt about the meaning of the term "detain" in the relevant statutory provisions, the context in which they appear would put that doubt to rest. Title 8 of the United States Code, the title dealing with immigration, is replete with references that distinguish between "detained" aliens and aliens who are free to walk the streets in the way the dissent imagines. Section 1226(a), for instance, distinguishes between the power to "continue to detain the arrested alien" and the power to "release the alien on . . . bond." But if the dissent were right, that distinction would make no sense: An "alien released on bond" would *also* be a "detained alien." Here is another example: In §1226(b), Congress gave the Attorney General the power to "revoke" at any time "a bond or parole authorized under subsection (a) of this section, rearrest the alien under the original warrant, and detain the alien." It beggars belief that Congress would have given the Attorney General the power to detain a class of aliens who, under the dissent's reading, are *already* "detained" because they are free on bond. But that is what the dissent would have us believe. Consider, finally, the example of §1226(c). As noted, that provision obligates the Attorney General to "take into custody" certain aliens whenever

they are "released, without regard to whether the alien is released on parole, supervised release, or probation." On the dissent's view, however, even aliens "released on parole, supervised release, or probation" are "in custody"— and so there would be no need for the Attorney General to take them into custody again.[6]

Struggling to prop up its implausible interpretation, the dissent looks to our prior decisions for aid, but that too fails. The best case it can find is *Tod* v. *Waldman,* 266 U. S. 547 (1925), a grant of a petition for rehearing in which the Court clarified that "[n]othing in [its original] order . . . shall prejudice an application for release on bail of the respondents pending compliance with the mandate of this Court." *Id.,* at 548. According to the dissent, that two-page decision from almost a century ago supports its reading because the underlying immigration statute in that case—like some of the provisions at issue here— mandated that the relevant class of aliens "'shall be detained'" pending the outcome of an inspection process.

---

[6]As the dissent notes, §1158(d)(2) regulates employment authorization for certain "applicant[s] for asylum." Were all asylum applicants detained, the dissent says, that provision would make no sense, because detained aliens do not need work authorizations. *Post,* at 23–24. But §1158(d)(2) applies not only to aliens seeking asylum status "in accordance with . . . section 1225(b)" (and thus aliens who are detained), but also to all aliens already "physically present in the United States." §1158(a)(1). Many of those aliens will be in the country lawfully, and thus they will not be detained and will be able to work pending the outcome of their asylum application. For example, an alien may apply for asylum after being admitted into the country on a short-term visa. While the application is pending, §1158 may offer a way for that alien to find employment.

In response, the dissent accuses us of "apply[ing] this provision to some asylum applicants but not the ones before us." *Post,* at 23–24. That is not remotely what we are doing. We do not doubt that §1158(d)(2) "applies" to all "applicant[s] for asylum" as it says, even if some of those applicants are not as likely to receive an employment authorization (for instance, because they are detained) as others.

See *post,* at 21–22 (quoting Act of Feb. 5, 1917, §16, 39 Stat. 886).

That reads far too much into *Waldman*. To start, the Court did not state that the aliens at issue were entitled to bail or even that bail was available to them. Instead, the Court merely noted that its decision should not "prejudice" any application the aliens might choose to file. That is notable, for in their petition for rehearing the aliens had asked the Court to affirmatively "*authorize* [them] to give bail." Petition for Rehearing in *Tod* v. *Waldman*, O. T. 1924, No. 95, p. 17 (emphasis added). By refusing to do so, the Court may have been signaling its skepticism about their request. But it is impossible to tell. That is precisely why we, unlike the dissent, choose not to go beyond what the sentence actually says. And *Waldman* says nothing about how the word "detain" should be read in the context of §§1225(b), 1226(c), and 1226(a).[7]

Neither does *Zadvydas*. It is true, as the dissent points out, that *Zadvydas* found "that the words '"may be detained"' [are] consistent with requiring release from long-term detention," *post,* at 23 (quoting 533 U. S., at 682), but that is not because there is any ambiguity in the term "detain." As we have explained, the key statutory provision in *Zadvydas* said that the aliens in question "may," not "shall," be detained, and that provision also failed to specify how long detention was to last. Here, the statutory provisions at issue state either that the covered aliens "shall" be detained until specified events take place, see 8 U. S. C. §1225(b)(1)(B)(ii) ("further consideration of the

---

[7] It should not be surprising by this point that even the aliens in *Waldman* understood "detention" in contradistinction to "bail." See Petition for Rehearing in *Tod* v. *Waldman*, O. T. 1924, No. 95, pp. 17–18 ("[T]he Court's mandate should authorize relators to give bail, instead of having [them] go to Ellis Island and remain there *in custody* pending an appeal . . . which may involve very long *detention* pending hearing of the appeal . . ." (capitalization omitted and emphasis added)).

application for asylum"); §1225(b)(2)(A) ("a [removal] proceeding"), or provide that the covered aliens may be released "only if" specified conditions are met, §1226(c)(2). The term that the *Zadvydas* Court found to be ambiguous was "may," not "detain." See 533 U. S., at 697. And the opinion in that case consistently used the words "detain" and "custody" to refer exclusively to physical confinement and restraint. See *id.,* at 690 (referring to "[f]reedom from imprisonment—from government custody, *detention, or other forms of physical restraint*" (emphasis added)); *id.,* at 683 (contrasting aliens "released on bond" with those "held in custody").[8]

The dissent offers no plausible interpretation of §§1225(b), 1226(c), and 1226(a). But even if we were to accept the dissent's interpretation and hold that "detained" aliens in the "custody" of the Government include aliens released on bond, that would *still* not justify the dissent's proposed resolution of this case. The Court of Appeals held that aliens detained under the provisions at issue must be given *periodic* bond hearings, and the dissent agrees. See *post,* at 2 ("I would interpret the statute as requiring bail hearings, presumptively after six months of confinement"). But the dissent draws that 6-month limitation out of thin air. However broad its interpretation of the words "detain" and "custody," nothing in *any* of the relevant provisions imposes a 6-month time limit on detention without the possibility of bail. So if the dissent's interpretation is right, then aliens detained under §§1225(b), 1226(c), and 1226(a) are entitled to bail hearings as soon as their detention begins rather than six

---

[8] The dissent argues that because "the question at issue [in *Zadvydas*] was release from detention," "the key word was consequently 'may.'" *Post,* at 23. We agree but fail to see the point. If, as the dissent admits, *Zadvydas* was about "release from detention" and not about what qualifies as "detention," then it is unclear why the dissent thinks that decision supports its unorthodox interpretation of the word "detention."

months later. "Detained" does not mean "released on bond," and it *certainly* does not mean "released on bond but only after six months of mandatory physical confinement."

The dissent's utterly implausible interpretation of the statutory language cannot support the decision of the court below.

V

Because the Court of Appeals erroneously concluded that periodic bond hearings are required under the immigration provisions at issue here, it had no occasion to consider respondents' constitutional arguments on their merits. Consistent with our role as "a court of review, not of first view," *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7 (2005), we do not reach those arguments. Instead, we remand the case to the Court of Appeals to consider them in the first instance.

Before the Court of Appeals addresses those claims, however, it should reexamine whether respondents can continue litigating their claims as a class. When the District Court certified the class under Rule 23(b)(2) of the Federal Rules of Civil Procedure, it had their statutory challenge primarily in mind. Now that we have resolved that challenge, however, new questions emerge.

Specifically, the Court of Appeals should first decide whether it continues to have jurisdiction despite 8 U. S. C. §1252(f)(1). Under that provision, "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of [§§1221–1232] other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." Section 1252(f)(1) thus "prohibits federal courts from granting classwide injunctive relief against the operation of §§1221–123[2]." *American-Arab Anti-Discrimination Comm.*, 525 U. S., at 481. The Court

of Appeals held that this provision did not affect its jurisdiction over respondents' *statutory* claims because those claims did not "seek to enjoin the operation of the immigration detention statutes, but to enjoin conduct . . . not authorized by the statutes." 591 F. 3d, at 1120. This reasoning does not seem to apply to an order granting relief on constitutional grounds, and therefore the Court of Appeals should consider on remand whether it may issue classwide injunctive relief based on respondents' constitutional claims. If not, and if the Court of Appeals concludes that it may issue only declaratory relief, then the Court of Appeals should decide whether that remedy can sustain the class on its own. See, *e. g.,* Rule 23(b)(2) (requiring "that final injunctive relief or *corresponding* declaratory relief [be] appropriate respecting the class as a whole" (emphasis added)).

The Court of Appeals should also consider whether a Rule 23(b)(2) class action continues to be the appropriate vehicle for respondents' claims in light of *Wal-Mart Stores, Inc.* v. *Dukes*, 564 U. S. 338 (2011). We held in *Dukes* that "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Id.,* at 360. That holding may be relevant on remand because the Court of Appeals has already acknowledged that some members of the certified class may not be entitled to bond hearings as a constitutional matter. See, *e. g.,* 804 F. 3d, at 1082; 715 F. 3d, at 1139–1141 (citing, *e. g., Shaughnessy* v. *United States ex rel. Mezei*, 345 U. S. 206 (1953)). Assuming that is correct, then it may no longer be true that the complained-of "'conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Dukes*, *supra*, at 360 (quoting Nagareda, Class Certification in the Age of Aggregate Proof, 84 N. Y. U. L. Rev. 97, 132 (2009)).

Similarly, the Court of Appeals should also consider on

remand whether a Rule 23(b)(2) class action litigated on common facts is an appropriate way to resolve respondents' Due Process Clause claims. "[D]ue process is flexible," we have stressed repeatedly, and it "calls for such procedural protections as the particular situation demands." *Morrissey* v. *Brewer*, 408 U. S. 471, 481 (1972); see also *Landon* v. *Plasencia*, 459 U. S. 21, 34 (1982).

## VI

We reverse the judgment of the United States Court of Appeals for the Ninth Circuit and remand the case for further proceedings.

*It is so ordered.*

JUSTICE KAGAN took no part in the decision of this case.

# SUPREME COURT OF THE UNITED STATES

_____

No. 15–1204

_____

## DAVID JENNINGS, ET AL., PETITIONERS *v.* ALEJANDRO RODRIGUEZ, ET AL., INDIVID- UALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[February 27, 2018]

JUSTICE THOMAS, with whom JUSTICE GORSUCH joins except for footnote 6, concurring in Part I and Parts III–VI and concurring in the judgment.

In my view, no court has jurisdiction over this case. Congress has prohibited courts from reviewing aliens' claims related to their removal, except in a petition for review from a final removal order or in other circumstances not present here. See 8 U. S. C. §1252(b)(9). Respondents have not brought their claims in that posture, so §1252(b)(9) removes jurisdiction over their challenge to their detention. I would therefore vacate the judgment below with instructions to dismiss for lack of jurisdiction. But because a majority of the Court believes we have jurisdiction, and I agree with the Court's resolution of the merits, I join Part I and Parts III–VI of the Court's opinion.

## I

Respondents are a class of aliens whose removal proceedings are ongoing. Respondents allege that the statutes that authorize their detention during removal proceedings do not authorize "prolonged" detention unless they are given an individualized bond hearing at which

the Government "prove[s] by clear and convincing evidence" that their detention remains justified. Third Amended Complaint in *Rodriguez* v. *Holder*, No. CV 07–03239 (CD Cal., Oct. 22, 2010), pp. 30–31 (Third Amended Complaint). If the statutes do authorize "prolonged" detention, respondents claim that the statutes violate the Due Process Clause of the Fifth Amendment. *Ibid.* In their complaint, respondents sought declaratory and injunctive relief from detention during their removal proceedings. *Id.,* at 31–32. The District Court certified a class of aliens under Federal Rule of Civil Procedure 23(b)(2) who, among other things, "are or were detained for longer than six months pursuant to one of the general immigration detention statutes." Class Certification Order in *Rodriguez* v. *Holder*, No. CV 07–03239 (CD Cal., Apr. 5, 2010), p. 2; *Rodriguez* v. *Hayes*, 591 F. 3d 1105, 1122–1126 (CA9 2010). After the parties moved for summary judgment, the District Court entered a permanent injunction in favor of the class, which requires the named Government officials[1] to take steps to "timely identify all current and future class members," to update class member lists with the District Court every 90 days, and to provide class members with bond hearings that comply with particular substantive and procedural requirements. Order, Judgment, and Permanent Injunction in *Rodriguez* v. *Holder*, No. CV 07–03239 (CD Cal., Aug. 6, 2013), pp. 5–6 (Order, Judgment, and Permanent Injunction).

---

[1] The named Government officials are the Attorney General of the United States, the Secretary of the Department of Homeland Security, the Director of the Executive Office for Immigration Review, the Director and Assistant Director of the Los Angeles District of Immigration and Customs Enforcement, and several directors of jails and detention facilities.

## II
## A

Although neither party raises §1252(b)(9), this Court has an "independent obligation" to assess whether it deprives us and the lower courts of jurisdiction. *Arbaugh* v. *Y & H Corp.*, 546 U. S. 500, 514 (2006). This Court has described §1252(b)(9) as a "'zipper' clause." See *Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U. S. 471, 483 (1999) (*AADC*); *INS* v. *St. Cyr*, 533 U. S. 289, 313 (2001). That description is apt because, when an alien raises a claim related to his removal, §1252(b)(9) closes all but two avenues for judicial review:

> "**Consolidation of questions for judicial review**
>
> "Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under [8 U. S. C. §§1151–1382] shall be available *only in judicial review of a final order under this section*. Except *as otherwise provided in this section*, no court shall have jurisdiction, by habeas corpus under section 2241 of title 28 or any other habeas corpus provision, by section 1361 or 1651 of such title, or by any other provision of law (statutory or nonstatutory), to review such an order or such questions of law or fact." (Emphasis added.)

The text of this provision is clear. Courts generally lack jurisdiction over "all questions of law and fact," both "constitutional" and "statutory," that "aris[e] from" an "action taken or proceeding brought to remove an alien." If an alien raises a claim arising from such an action or proceeding, courts cannot review it unless they are reviewing "a final order" under §1252(a)(1) or exercising jurisdiction

"otherwise provided" in §1252.[2]  Neither "habeas corpus" nor "any other provision of law" can be used to avoid §1252(b)(9)'s jurisdictional bar.  In short, if a claim arises from an action taken to remove an alien, §1252(b)(9) permits judicial review in only two circumstances: in connection with review of a final removal order and via a specific grant of jurisdiction in §1252.

Respondents do not argue that any specific grant of jurisdiction applies here, and they do not seek review of a final removal order under §1252(a)(1).  Thus, a court may review respondents' claims only if they can show that §1252(b)(9)'s jurisdictional bar does not apply in the first place because their claims do not "aris[e] from any action taken or proceeding brought to remove an alien."

Respondents cannot make that showing.  Section 1252(b)(9) is a "general jurisdictional limitation" that applies to "all claims arising from deportation proceedings" and the "many . . . decisions or actions that may be part of the deportation process." *AADC, supra*, at 482–483.  Detaining an alien falls within this definition— indeed, this Court has described detention during removal proceedings as an "aspect of the deportation process." *Demore* v. *Kim*, 538 U. S. 510, 523 (2003); see also *Carlson* v. *Landon*, 342 U. S. 524, 538 (1952) ("Detention is necessarily a part of [the] deportation procedure").  As the Court explains today, Congress either mandates or permits the detention of aliens for the entire duration of their removal proceedings.  See *ante*, at 12–23.  This detention, the

_____

[2] Section 1252 provides a few specific grants of jurisdiction beyond §1252(a)(1)'s general grant of jurisdiction over final removal orders and all other related questions of law and fact.  Section 1252(b)(7), for example, allows an alien to challenge the validity of his removal order during criminal proceedings if he is charged with willfully failing to depart the United States.  And §1252(e)(2) allows an alien who is denied admission to the United States and ordered removed to raise certain claims in habeas corpus proceedings.

Court further explains, is meant to ensure that the Government can ultimately remove them. See *ante*, at 1; accord, *Demore*, *supra*, at 528 (explaining that detention during removal proceedings "necessarily serves the purpose of preventing deportable criminal aliens from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered removed, the aliens will be successfully removed"). The phrase "any action taken . . . to remove an alien from the United States" must at least cover congressionally authorized portions of the deportation process that necessarily serve the purpose of ensuring an alien's removal. Claims challenging detention during removal proceedings thus fall within the heartland of §1252(b)(9).

### B

The plurality, the dissent, and respondents each offer reasons why §1252(b)(9) does not apply to this case. The plurality reasons that applying §1252(b)(9) to detention claims requires an overly expansive reading of "arising from." See *ante*, at 9–10. The dissent contends that §1252(b)(9) applies only to challenges to the removal order itself. *Post*, at 31. And respondents argue that, if §1252(b)(9) applies to their claims, they will have no meaningful way to challenge their detention during their removal proceedings.[3] Tr. of Oral Arg. 36. None of these arguments persuades me.

### 1

The plurality asserts that §1252(b)(9) covers respond-

---

[3] Respondents also asserted at oral argument that the Government "has said repeatedly" that §1252(b)(9) does not apply to detention claims. Tr. of Oral Arg. 36. But our "independent obligation" to evaluate jurisdiction, *Arbaugh* v. *Y & H Corp.*, 546 U. S. 500, 514 (2006), means that we cannot accept the Government's concessions on this point. See *King Bridge Co.* v. *Otoe County*, 120 U. S. 225, 226 (1887).

ents' claims only if the words "arising from" are given an "expansive interpretation." *Ante,* at 9. I am of a different view. Even if "arising from" is read narrowly, §1252(b)(9) still covers the claims at issue in this case. That is because detention *is* an "action taken . . . to remove" an alien. And even the narrowest reading of "arising from" must cover claims that directly challenge such actions. See *AADC*, 525 U. S., at 482–483.

The main precedent that the plurality cites to support its narrow reading of "arising from" demonstrates that §1252(b)(9) applies here. See *ante*, at 10 (citing *AADC*, 525 U. S., at 482–483). In *AADC*, the Court explained that §1252(b)(9) covers "all claims arising from deportation proceedings" and the "many . . . decisions or actions that may be part of the deportation process." *Ibid.* The Court even listed examples of the type of claims that would be covered, including challenges to the decision "to open an investigation" and the decision "to surveil the suspected [immigration-law] violator." *Id.,* at 482. If surveilling a suspected violator falls under the statute, then the detention of a known violator certainly does as well.

The plurality dismisses my "expansive interpretation" because it would lead to "staggering results," supposedly barring claims that are far afield from removal. See *ante,* at 9 (describing lawsuits challenging inhumane conditions of confinement, assaults, and negligent driving). But that is not the case. Unlike detention during removal proceedings, those actions are neither congressionally authorized nor meant to ensure that an alien can be removed. Thus, my conclusion that §1252(b)(9) covers an alien's challenge to the *fact* of his detention (an action taken in pursuit of the lawful objective of removal) says nothing about whether it also covers claims about inhumane treatment, assaults, or negligently inflicted injuries suffered *during* detention (actions that go beyond the Government's lawful

pursuit of its removal objective).  Cf. *Bell* v. *Wolfish*, 441 U. S. 520, 536–539 (1979) (drawing a similar distinction).

2

The dissent takes a different approach.  Relying on the prefatory clause to §1252(b), it asserts that §1252(b)(9) "by its terms applies only '[w]ith respect to review of an order of removal under [§1252(a)(1)].'"  *Post*, at 31 (quoting 8 U. S. C. §1252(b)).  The dissent reads the prefatory clause to mean that §1252(b)(9) applies only to a "challenge [to] an order of removal."  *Post*, at 31.  That reading is incorrect.

Section 1252(b)(9) is not restricted to challenges to removal orders.  The text refers to review of "*all* questions of law and fact" arising from removal, not just removal orders.   (Emphasis added.)   And it specifies that §1252(a)(1) provides the only means for reviewing "such an order *or* such questions of law or fact."  *Ibid.* (emphasis added).  The term "or" is "'almost always disjunctive, that is, the words it connects are to be given separate meanings.'"  *Loughrin* v. *United States*, 573 U. S. \_\_\_, \_\_\_ (2014) (slip op., at 6) (quoting *United States* v. *Woods*, 571 U. S. 31, 45–46 (2013)).  By interpreting §1252(b)(9) as governing only removal orders, the dissent reads "or such questions of law or fact" out of the statute.  It also renders superfluous §1252(a)(5), which already specifies that the review made available under §1252(a)(1) "shall be the sole and exclusive means for judicial review of *an order of removal*."  This Court typically disfavors such interpretations.  See *AADC*, *supra*, at 483.

The prefatory clause of §1252(b) does not change the meaning of §1252(b)(9).  The prefatory clause states that the subparagraphs of §1252(b), including §1252(b)(9), impose requirements "[w]ith respect to review of an order of removal under subsection (a)(1)."  The phrase "with respect to" means "referring to," "concerning," or "relating

to." Oxford American Dictionary and Language Guide 853 (1999 ed.); accord, Webster's New Universal Unabridged Dictionary 1640 (2003 ed.); American Heritage Dictionary 1485 (4th ed. 2000). Read together, the prefatory clause and §1252(b)(9) mean that review of all questions arising from removal must occur in connection with review of a final removal order under §1252(a)(1), which makes sense given that §1252(b)(9) is meant to "[c]onsolidat[e] . . . questions for judicial review." Tellingly, on the two previous occasions when this Court interpreted §1252(b)(9), it did not understand §1252(b)(9) as limited to challenges to removal orders. See *AADC*, *supra,* at 482–483 (stating that §1252(b)(9) is a "general jurisdictional limitation" that applies to "all claims arising from deportation proceedings" and "the many . . . decisions or actions that may be part of the deportation process"); *St. Cyr*, 533 U. S., at 313, n. 37 (clarifying that §1252(b)(9) requires "claims that were viewed as being outside of a 'final order'" to be "consolidated in a petition for review and considered by the courts of appeals" in their review of the final removal order under §1252(a)(1)). Thus, despite the dissent's assertion to the contrary, the prefatory clause plainly does not change the scope of §1252(b)(9), which covers "all questions of law or fact" arising from the removal process.

3

At oral argument, respondents asserted that, if §1252(b)(9) bars their lawsuit, then the only review available would be "a petition for review of [a] final removal order" under §1252(a)(1), which takes place "after all the detention has already happened."[4] Tr. of Oral Arg. 36. I

—————

[4] Contrary to respondents' argument, some of the respondents will get review before "all the detention has already happened." Respondents who successfully petition for review to the Court of Appeals from a final removal order and obtain a remand to the immigration court, like class representative Alejandro Rodriguez did here, will have an opportunity

interpret respondents' argument as a claim that §1252(b)(9) would be unconstitutional if it precluded meaningful review of their detention. This argument is unpersuasive and foreclosed by precedent.

The Constitution does not guarantee litigants the most effective means of judicial review for every type of claim they want to raise. See *AADC*, 525 U. S., at 487–492 (rejecting a similar argument); *Heikkila* v. *Barber*, 345 U. S. 229, 237 (1953) (explaining that limitations on judicial review of deportation must be followed "despite [their] apparent inconvenience to the alien"). This is especially true in the context of deportation, where limits on the courts' jurisdiction have existed for almost as long as federal immigration laws, and where this Court has repeatedly affirmed the constitutionality of those limits.[5]

Indeed, this Court has already rejected essentially the same argument that respondents raise here. In *AADC*, the Court held that §1252(g), a provision similar to §1252(b)(9), barred the aliens' claim that the Government was violating the First Amendment by selectively enforc-

―――――――

to obtain review of their detention before it is complete. See Third Amended Complaint, at 9–12.

[5] See, *e.g.,* Act of Aug. 18, 1884, 28 Stat. 390 ("In every case where an alien is excluded from admission into the United States under any law or treaty now existing or hereinafter made, the decision of the appropriate immigration or customs officers, if adverse to the admission of such alien, shall be final, unless reversed on appeal to the Secretary of Treasury"), upheld in *Lem Moon Sing* v. *United States*, 158 U. S. 538, 547–550 (1895); Immigration Act of 1891, §8, 26 Stat. 1085 ("All decisions made by the inspection officers or their assistants touching the right of any alien to land, when adverse to such right, shall be final unless appeal be taken to the superintendent of immigration, whose action shall be subject to review by the Secretary of Treasury"), upheld in *Ekiu* v. *United States*, 142 U. S. 651, 660 (1892); 1917 Immigration Act, §19, 39 Stat. 890 ("In every case where any person is ordered deported from the United States under the provisions of this Act, or of any law or treaty, the decision of the Secretary of Labor shall be final"), upheld in *Heikkila*, 345 U. S., at 233–235, 237.

ing the immigration laws against them. 525 U. S., at 487–
492. The aliens argued that constitutional avoidance
required the Court to interpret §1252(g) as not applying to
their claims because the only remaining avenue for re-
view—a petition for review of a final removal order under
§1252(a)(1)—would be "unavailing" and would "come too
late to prevent the 'chilling effect' upon their First
Amendment rights." *Id.*, at 487–488. The Court rejected
this argument because "an alien unlawfully in this coun-
try has no constitutional right to assert selective enforce-
ment as a defense against his deportation." *Id.*, at 488.
The Court further explained that it had a duty to enforce
Congress' limitations on judicial review, except perhaps in
"a rare case in which the alleged basis of discrimination is
so outrageous that the foregoing considerations [justifying
limited review could] be overcome." *Id.*, at 491.

Like in *AADC*, respondents' lack-of-meaningful-review
argument does not allow us to ignore the jurisdictional
limitations that Congress has imposed. This Court has
never held that detention during removal proceedings is
unconstitutional. To the contrary, this Court has repeat-
edly recognized the constitutionality of that practice. See
*Demore*, 538 U. S., at 523 (explaining that detention is "a
constitutionally valid aspect of the deportation process");
accord, *Reno* v. *Flores*, 507 U. S. 292, 305–306 (1993);
*Shaughnessy* v. *United States ex rel. Mezei*, 345 U. S. 206,
215 (1953); *Carlson*, 342 U. S., at 538, 542. Nor does this
lawsuit qualify as the "rare case in which the alleged
[executive action] is so outrageous" that it could thwart
the jurisdictional limitations in §1252(b)(9). *AADC*, *supra*,
at 491. The Government's detention of respondents is
entirely routine and indistinguishable from the detention
that we have repeatedly upheld in the past. Thus, regard-
less of the inconvenience that §1252(b)(9) might pose for
respondents, this Court must enforce it as written. Re-
spondents must raise their claims in petitions for review of

their final removal orders.[6]

### III

Because I conclude that §1252(b)(9) bars jurisdiction to hear respondents' claims, I will also address whether its application to this case violates the Suspension Clause, see Art. I, §9, cl. 2 ("The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it"). It does not. Even assuming the Suspension Clause bars Congress from stripping habeas jurisdiction over respondents' claims, but see *St. Cyr*, 533 U. S., at 337–346 (Scalia, J., dissenting), this case does not involve a habeas petition.

Respondents do not seek habeas relief, as understood by our precedents. Although their complaint references the general habeas statute, see Third Amended Complaint, at 1, it is not a habeas petition. The complaint does not request that the District Court issue any writ. See *id.*, at 31–32. Rather, it seeks a declaration and an injunction that would provide relief for both present and future class members, including future class members not yet detained. *Ibid.* Indeed, respondents obtained class certification under Federal Rule of Civil Procedure 23(b)(2), which applies only when the class seeks "final injunctive relief or corresponding declaratory relief."[7]

––––––––––

[6] I take no position on whether some of the respondents will face other jurisdictional hurdles, even on review of their final removal orders. See, *e.g.,* §§1252(a)(2)(A), (B). I also continue to agree with Justice O'Connor's concurring opinion in *Demore* v. *Kim*, 538 U. S. 510 (2003), which explained that §1226(e) "unequivocally deprives federal courts of jurisdiction to set aside 'any action or decision' by the Attorney General" regarding detention. *Id.*, at 533 (opinion concurring in part and concurring in judgment).

[7] This Court has never addressed whether habeas relief can be pursued in a class action. See *Schall* v. *Martin*, 467 U. S. 253, 261, n. 10 (1984) (reserving this question). I take no position on that issue here,

Nor did respondents obtain habeas relief. When their case concluded, respondents obtained a classwide permanent injunction. See Order, Judgment, and Permanent Injunction, at 5–6. That classwide injunction looks nothing like a typical writ. It is not styled in the form of a conditional or unconditional release order. Cf. *United States* v. *Jung Ah Lung*, 124 U. S. 621, 622 (1888) (describing habeas relief as "order[ing] the discharge from custody of the person in whose behalf the writ was sued out"); *Chin Yow* v. *United States*, 208 U. S. 8, 13 (1908) (awarding habeas relief by ordering the release of the alien if certain conditions were not satisfied). It applies to future class members, including individuals who were not in custody when the injunction was issued. Cf. 28 U. S. C. §2241(c) (generally precluding issuance of the writ unless the petitioner is "in custody"). And it is directed to at least one individual, the Director for the Executive Office for Immigration Review, who is not a custodian. Cf. *Rumsfeld* v. *Padilla*, 542 U. S. 426, 434 (2004) (explaining that "the proper respondent to a habeas petition is 'the person who has custody over [the petitioner]'" (quoting 28 U. S. C. §2242)).

Immigration law has long drawn a distinction between the declaratory and injunctive relief that respondents sought here and habeas relief. In *Heikkila*, for instance, this Court distinguished habeas relief from "injunctions, declaratory judgments and other types of relief" that "courts ha[d] consistently rejected" in immigration cases. 345 U. S., at 230. The Court rejected the alien's request for "injunctive and declaratory relief" because Congress had authorized courts to grant relief only in habeas proceedings. *Id.,* at 230, 237. We reaffirmed this distinction in *St. Cyr*, where we noted that the 1961 Immigration and

since I conclude that respondents are not seeking habeas relief in the first place.

Nationality Act, 75 Stat. 650, withdrew the district courts' "authority to grant declaratory and injunctive relief," but not habeas relief. 533 U. S., at 309–310; see also *Shaughnessy* v. *Pedreiro*, 349 U. S. 48, 49, 52–53 (1955) (holding that the Administrative Procedure Act, which authorizes courts to grant declaratory and injunctive relief, authorized "judicial review of deportation orders *other than by habeas corpus*" (emphasis added)). And Congress has confirmed this distinction in its immigration statutes by allowing one form of relief, but not the other, in particular circumstances. Compare, *e.g.,* §1252(e)(1) (prohibiting courts from granting "declaratory, injunctive, or other equitable relief in any action pertaining to an order to exclude an alien in accordance with section 1225(b)(1)") with §1252(e)(2) (allowing "judicial review . . . in habeas corpus proceedings" of particular "determination[s] made under section 1225(b)(1)").

Respondents' suit for declaratory and injunctive relief, in sum, is not a habeas petition. The Suspension Clause protects "[t]he Privilege of the Writ of Habeas Corpus," not requests for injunctive relief. Because respondents have not sought a writ of habeas corpus, applying §1252(b)(9) to bar their suit does not implicate the Suspension Clause.

\*  \*  \*

Because §1252(b)(9) deprives courts of jurisdiction over respondents' claims, we should have vacated the judgment below and remanded with instructions to dismiss this case for lack of jurisdiction. But a majority of the Court has decided to exercise jurisdiction. Because I agree with the Court's disposition of the merits, I concur in Part I and Parts III–VI of its opinion.

# SUPREME COURT OF THE UNITED STATES

_____

No. 15–1204

_____

DAVID JENNINGS, ET AL., PETITIONERS *v.*
ALEJANDRO RODRIGUEZ, ET AL., INDIVID-
UALLY AND ON BEHALF OF ALL OTHERS
SIMILARLY SITUATED

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[February 27, 2018]

JUSTICE BREYER, with whom JUSTICE GINSBURG and
JUSTICE SOTOMAYOR join, dissenting.

This case focuses upon three groups of noncitizens held
in confinement. Each of these individuals believes he or
she has the right to enter or to remain within the United
States. The question is whether several statutory provi-
sions of the Immigration and Nationality Act, 8 U. S. C.
§1101 *et seq.,* forbid granting them bail.

The noncitizens at issue are asylum seekers, persons
who have finished serving a sentence of confinement (for a
crime), or individuals who, while lacking a clear entitle-
ment to enter the United States, claim to meet the criteria
for admission, see *infra*, at 20, 25–26, 29–30. The Gov-
ernment has held all the members of the groups before us
in confinement for many months, sometimes for years,
while it looks into or contests their claims. But ultimately
many members of these groups win their claims and the
Government allows them to enter or to remain in the
United States. Does the statute require members of these
groups to receive a bail hearing, after, say, six months of
confinement, with the possibility of release on bail into the
community *provided* that they do not pose a risk of flight
or a threat to the community's safety?

The Court reads the statute as forbidding bail, hence forbidding a bail hearing, for these individuals. In my view, the majority's interpretation of the statute would likely render the statute unconstitutional. Thus, I would follow this Court's longstanding practice of construing a statute "so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score." *United States* v. *Jin Fuey Moy*, 241 U. S. 394, 401 (1916). And I would interpret the statute as requiring bail hearings, presumptively after six months of confinement. Cf. *Zadvydas* v. *Davis*, 533 U. S. 678, 701 (2001).

# I

## *The Respondents*

Because of their importance to my conclusion, I shall repeat, with references to record support, the key characteristics of the groups of noncitizens who appear before us.

*First*, as I have said, the respondents in this case are members of three special classes of noncitizens, the most important of whom (1) arrive at our borders seeking asylum or (2) have committed crimes but have finished serving their sentences of imprisonment. We also consider those who (3) arrive at our borders believing they are entitled to enter the United States for reasons other than asylum seeking, but lack a clear entitlement to enter.

*Second*, *all* members of the first group, the asylum seekers, have been found (by an immigration official) to have a "credible fear of persecution" in their home country should the United States deny them admittance. 8 U. S. C. §1225(b)(1)(B)(ii). *All* members of the second group have, as I have said, finished serving their criminal sentences of confinement. §1226(c)(1). *All* members of the third group may have (or may simply believe they have) a strong claim for admittance, but they are neither "clearly and beyond a doubt entitled to be admitted" nor conclusively determined to be inadmissible by an immigration

officer on grounds of fraud or lack of required documentation. §1225(b)(2)(A); see §§1225(b)(1)(A)(i), 1182(a)(6)(C), (a)(7).

*Third*, members of the first two classes number in the thousands. See Brief for 46 Social Science Researchers and Professors as *Amici Curiae* 6, 8 (identifying, in 2015, 7,500 asylum seekers and 12,220 noncitizens who have finished serving sentences of criminal confinement, a portion of whom are class members detained for more than six months).

*Fourth*, detention is often lengthy. The classes before us consist of people who were detained for at least six months and on average one year. App. 92, 97. The record shows that the Government detained some asylum seekers for 831 days (nearly 2½ years), 512 days, 456 days, 421 days, 354 days, 319 days, 318 days, and 274 days—before they won their cases and received asylum. *Id.*, at 97, 228–236. It also shows that the Government detained one noncitizen for nearly four years *after* he had finished serving a criminal sentence, and the Government detained other members of this class for 608 days, 561 days, 446 days, 438 days, 387 days, and 305 days—all before they won their cases and received relief from removal. *Id.*, at 92, 213–220.

*Fifth*, many of those whom the Government detains eventually obtain the relief they seek. Two-thirds of the asylum seekers eventually receive asylum. *Id.*, at 98 (Table 28); *id.*, at 135 (Table 38); App. to Pet. for Cert. 40a. Nearly 40% of those who have served criminal sentences receive relief from removal, because, for example, their earlier conviction involved only a short sentence. See App. 95 (Table 23); *id.*, at 135 (Table 38). See also App. to Pet. for Cert. 34a; App. 210, 216–217, 312–313 (between one-half and two-thirds of the class served sentences less than six months, *e.g.,* a 2-month sentence for being under the influence of a controlled substance, or an 8-day jail term

for a minor firearms offense).

*Sixth*, these very asylum seekers would have received bail hearings had they first been taken into custody within the United States rather than at the border. See *In re X-K-*, 23 I. & N. Dec. 731, 734–735 (BIA 2005); 8 U. S. C. §1226(a).

*Seventh*, as for those who have finished serving their sentences (for crimes), some of those who are less dangerous would (on the majority's view) be held without bail the longest, because their claims will take longer to adjudicate. Moreover, those noncitizens would have no opportunity to obtain bail *while they pursue their claims*, but if they *lose* their claims, the Government must release them, typically within six months, if the Government can find no other country willing to take them. See *Zadvydas*, *supra,* at 701.

*Eighth,* all the respondents are held in detention within the geographical boundaries of the United States, either in facilities controlled by United States Immigration and Customs Enforcement (ICE) or in state or local jails that hold them on ICE's behalf. App. 302–304; see ICE, Detention Facility Locator, online at http://www.ice.gov/ detention-facilities (all Internet materials as last visited Feb. 21, 2018).

*Ninth*, the circumstances of their detention are similar, so far as we can tell, to those in many prisons and jails. And in some cases the conditions of their confinement are inappropriately poor. See Dept. of Homeland Security (DHS), Office of Inspector General (OIG), DHS OIG Inspection Cites Concerns With Detainee Treatment and Care at ICE Detention Facilities (2017) (reporting instances of invasive procedures, substandard care, and mistreatment, *e.g.*, indiscriminate strip searches, long waits for medical care and hygiene products, and, in the case of one detainee, a multiday lock down for sharing a cup of coffee with another detainee).

These record-based facts make evident what I said at the outset: The case concerns persons whom immigration authorities believe are not citizens and may not have a right to enter into, or remain within, the United States. Nonetheless they likely have a reasonable claim that they do have such a right. The Government detains them, often for many months while it determines the merits of, or contests, their claims. To repeat the question before us: Does the statute entitle an individual member of one of these classes to obtain, say, after six months of detention, a bail hearing to decide whether he or she poses a risk of flight or danger to the community and, if not, to receive bail?

## II
### *The Constitutional Question*

The majority reads the relevant statute as prohibiting bail and hence prohibiting a bail hearing. In my view, the relevant constitutional language, purposes, history, tradition, and case law all make clear that the majority's interpretation at the very least would raise "grave doubts" about the statute's constitutionality. See *Jin Fuey Moy*, 241 U. S., at 401.

### A

Consider the relevant constitutional language and the values that language protects. The Fifth Amendment says that "[n]o person shall be . . . deprived of life, liberty, or property without due process of law." An alien is a "person." See *Wong Wing* v. *United States*, 163 U. S. 228, 237–238 (1896). To hold him without bail is to deprive him of bodily "liberty." See *United States* v. *Salerno*, 481 U. S. 739, 748–751 (1987). And, where there is no bail proceeding, there has been no bail-related "process" at all. The Due Process Clause—itself reflecting the language of the Magna Carta—prevents arbitrary detention. Indeed,

"[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Foucha* v. *Louisiana*, 504 U. S. 71, 80 (1992); see also *Demore* v. *Kim*, 538 U. S. 510, 532 (2003) (KENNEDY, J., concurring); *Zadvydas*, 533 U. S., at 718 (KENNEDY, J., dissenting).

The Due Process Clause foresees eligibility for bail as part of "due process." See *Salerno*, *supra,* at 748–751; *Schilb* v. *Kuebel*, 404 U. S. 357, 365 (1971); *Stack* v. *Boyle*, 342 U. S. 1, 4 (1951). Bail is "basic to our system of law." *Schilb*, *supra,* at 365. It not only "permits the unhampered preparation of a defense," but also "prevent[s] the infliction of punishment prior to conviction." *Stack*, *supra*, at 4. It consequently limits the Government's ability to deprive a person of his physical liberty where doing so is not needed to protect the public, see *Salerno*, *supra,* at 750–751, or to assure his appearance at, say, a trial or the equivalent, see *Stack*, *supra,* at 4–5. Why would this constitutional language and its bail-related purposes not apply to members of the classes of detained persons at issue here?

The Eighth Amendment reinforces the view that the Fifth Amendment's Due Process Clause does apply. The Eighth Amendment forbids "[e]xcessive bail." It does so in order to prevent bail being set so high that the level itself (rather than the reasons that might properly forbid release on bail) prevents provisional release. See *Carlson* v. *Landon*, 342 U. S. 524, 545 (1952) (explaining that the English clause from which the Eighth Amendment was copied was understood "to provide that bail shall not be excessive in those cases where it is proper to grant bail"). That rationale applies *a fortiori* to a refusal to hold any bail hearing at all. Thus, it is not surprising that this Court has held that both the Fifth Amendment's Due Process Clause and the Eighth Amendment's Excessive Bail Clause apply in cases challenging bail procedures.

See, *e.g., Salerno, supra,* at 746–755; *Carlson, supra,* at 537–546.

It is clear that the Fifth Amendment's protections extend to "all persons within the territory of the United States." *Wong Wing, supra,* at 238. But the Government suggests that those protections do not apply to asylum seekers or other arriving aliens because the law treats arriving aliens as if they had never entered the United States; hence they are not held within its territory.

This last-mentioned statement is, of course, false. All of these noncitizens are held within the territory of the United States at an immigration detention facility. Those who enter at JFK airport are held in immigration detention facilities in, *e.g.,* New York; those who arrive in El Paso are held in, *e.g.,* Texas. At most one might say that they are "constructively" held outside the United States: the word "constructive" signaling that we indulge in a "legal fiction," shutting our eyes to the truth. But once we admit to uttering a legal fiction, we highlight, we do not answer, the relevant question: *Why* should we engage in this legal fiction here?

The legal answer to this question is clear. We cannot here engage in this legal fiction. No one can claim, nor since the time of slavery has anyone to my knowledge successfully claimed, that persons held within the United States are totally without constitutional protection. Whatever the fiction, would the Constitution leave the Government free to starve, beat, or lash those held within our boundaries? If not, then, whatever the fiction, how can the Constitution authorize the Government to imprison arbitrarily those who, whatever we might pretend, are in reality right here in the United States? The answer is that the Constitution does not authorize arbitrary detention. And the reason that is so is simple: Freedom from arbitrary detention is as ancient and important a right as any found within the Constitution's boundaries. See

*Zadvydas*, *supra,* at 720–721 (KENNEDY, J., dissenting) ("inadmissible aliens" who are "stopped at the border" are "entitled to be free from detention that is arbitrary or capricious").

## B

The Due Process Clause, among other things, protects "those settled usages and modes of proceeding existing in the common and statute law of England, before the emigration of our ancestors," and which were brought by them to this country. *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272, 277 (1856). A brief look at Blackstone makes clear that at the time of the American Revolution the right to bail was "settled"—in both civil and criminal cases.

Blackstone tells us that every prisoner (except for a convict serving his sentence) was entitled to seek release on bail. 4 Commentaries on the Laws of England 296–297 (1769). This right applied in every criminal case. *Ibid.* A noncapital defendant could seek bail from a local magistrate; a capital defendant could seek bail at a hearing before the Court of King's Bench. See *ibid.* Although a capital defendant had no right to *obtain* bail, he could always *seek* it, because "the court of king's bench . . . may bail for any crime whatsoever, be it treason, murder, or any other offense, according to the circumstances of the case." *Id.,* at 296. And although King Charles I initially claimed the right to hold a prisoner without bail on secret national security grounds, see *Darnel's Case*, 3 How. St. Tr. 1 (K. B. 1627), Parliament responded by extracting from the King (via the 1628 Petition of Right) a promise to cease such detention. See 2 W. Hawkins, A Treatise of the Pleas of the Crown 107–110 (4th ed. 1771). From then on, bail was available even when a prisoner was held on the personal command of the King. *Ibid.* That is why Black-stone says that the King's Bench or its judges "may bail in

any Case whatsoever," 4 Analysis of the Laws of England 148 (6th ed. 1771), indeed, in civil cases too, for in Blackstone's time some private civil cases might have begun with an arrest. See 3 Blackstone, Commentaries 290 (1768). And bail was likewise an alternative to detention where a judgment debtor was unable to pay a civil judgment in the era of debtor's prison. See, *e.g., Beers* v. *Haughton*, 9 Pet. 329, 356 (1835) (explaining that under Ohio law, "if a defendant, upon a [writ of] capias, does not give sufficient appearance bail, he shall be committed to prison"); *Hamilton* v. *Dunklee*, 1 N. H. 172 (1818).

American history makes clear that the settlers brought this practice with them to America. The Judiciary Act of 1789 conferred rights to bail proceedings in all federal criminal cases. §33, 1 Stat. 91. It said that for a noncapital defendant "bail shall be admitted" and for a capital defendant bail may be admitted in the discretion of a district judge, a circuit judge, or a Justice of the Supreme Court, taking account of "the offence, and of the evidence, and the usages of law." *Ibid.* Congress enacted this law during its debate over the Bill of Rights, which it subsequently sent to the States for ratification. See 1 Annals of Cong. 90 (1789); see also *Martin* v. *Hunter's Lessee*, 1 Wheat. 304, 351 (1816) (Members of the First Congress were "men of great learning and ability, . . . who had acted a principal part in framing, supporting, or opposing" the Constitution itself). Colonial law had been similarly, or in some instances even more, protective. See Foote, The Coming Constitutional Crisis in Bail: I, 113 U. Pa. L. Rev. 959, 974–977 (1965).

Similar laws have consistently remained part of our legal tradition. In all federal criminal cases federal Acts have provided for bail proceedings. Bail Reform Act of 1984, 18 U. S. C. §3141 *et seq.*; Bail Reform Act of 1966, 18 U. S. C. §3146 *et seq.* (1964 ed., Supp. II). Every State has similar or more generous laws. See Appendix B, *infra.*

Standards for granting bail have changed somewhat over time. Initially the sole factor determining the outcome of a bail proceeding was risk of flight. See *Stack*, 342 U. S., at 4–5 (interpreting the 1789 bail law, applied to a noncapital defendant and in light of the Eighth Amendment, to require bail no higher than required to provide "adequate assurance" that the defendant "will stand trial and submit to sentence if found guilty," "based upon standards relevant to the purpose of assuring the presence of that defendant").

Congress gradually added community safety as a bail factor. In 1966, Congress provided that for capital defendants and convicted defendants pursuing appeals, bail would be granted unless the appeal was frivolous or a court had "reason to believe that no one or more conditions of release will reasonably assure that the person will not flee or pose a danger to any other person or to the community." Bail Reform Act of 1966 §3148. In 1984, Congress modified the bail standard for noncapital defendants by adding concern for community safety. §3142(e)(1). This Court, applying the Due Process Clause and the Excessive Bail Clause to these changes, found that the 1984 Act passed constitutional muster. See *Salerno*, 481 U. S., at 746–755. Again, the States typically apply roughly similar or more generous standards. See Appendix B, *infra.*

The cases before us, however, are not criminal cases. Does that fact make a difference? The problem is that there are not many instances of civil confinement (aside from immigration detention, which I address below). Mental illness does sometimes provide an example. Individuals dangerous to themselves or to others may be confined involuntarily to a mental hospital. See, *e.g.*, *United States* v. *Comstock*, 560 U. S. 126 (2010); *Kansas* v. *Hendricks*, 521 U. S. 346 (1997). Those persons normally do not have what we would call "a right to a bail hearing." But they do possess equivalent rights: They have the right

to a hearing prior to confinement and the right to review of the circumstances at least annually. See *Comstock, supra,* at 130–131 (initial hearing followed by review every six months); *Hendricks*, *supra*, at 353 (initial hearing followed by yearly review). And the mentally ill persons detained under these schemes are being detained *because* they are dangerous. That being so, there would be no point in providing a bail hearing as well. See *Salerno, supra*, at 748–749 (analogizing denial of bail to dangerous individuals to the civil commitment of the mentally ill). But there is every reason for providing a bail proceeding to the noncitizens at issue here, because they have received no individualized determination that they pose a risk of flight or present a danger to others, nor is there any evidence that most or all of them do.

This Court has also protected the right to a bail hearing during extradition proceedings. *Wright* v. *Henkel*, 190 U. S. 40 (1903), concerned the arrest and confinement of Whitaker Wright, an American citizen, pending extradition for a crime that Wright was accused of having committed in Great Britain. Wright sought bail. *Id.*, at 43. Since the federal bail laws applied only to those charged with committing crimes against the United States, they did not cover Wright's confinement. *Id.,* at 61–62. The relevant extradition statute said nothing about bail. *Id.,* at 62. Its language (stronger than the language at issue here) said that the individual was "to remain" in "the proper jail" until the "surrender shall be made" to the nation seeking extradition; and it added that he was "to remain" in custody "until delivered up"—though after two months he could seek release. Rev. Stat. §§5270, 5273.

In an opinion by Chief Justice Fuller, this Court unanimously wrote that, despite the lack of express statutory authorization and the risk of "embarrassment" to the United States if Wright fled, Wright could seek release on bail prior to the expiration of the 2-month period. *Wright,*

190 U. S., at 62–63.  Given the universal entitlement to
bail under English law, the Court was "unwilling to hold
that . . . courts may not in any case, and whatever the
special circumstances, extend that relief" to prisoners
awaiting extradition.  *Id.,* at 63.  It consequently read a
*silent* statute as authorizing bail proceedings (though the
Court went on to hold that, under applicable standards,
Wright's request for bail should be denied).  *Ibid.*

The strongest basis for reading the Constitution's bail
requirements as extending to these civil, as well as crimi-
nal, cases, however, lies in the simple fact that the law
treats like cases alike.  And reason tells us that the civil
confinement at issue here and the pretrial criminal con-
finement that calls for bail are in every relevant sense
identical.  There is no difference in respect to the fact of
confinement itself.  And I can find no relevant difference
in respect to bail-related purposes.

Which class of persons—criminal defendants or asylum
seekers—seems more likely to have acted in a manner
that typically warrants confinement?  A person charged
with a crime cannot be confined at all without a finding of
probable cause that he or she committed the crime.  And
the majority of criminal defendants lose their cases.  See
Dept. of Justice, Bureau of Justice Statistics, B. Reaves,
Felony Defendants in Large Urban Counties, 2009–
Statistical Tables, p. 24 (Dec. 2013) (reporting that 66% of
felony defendants were convicted).  A high percentage of
the noncitizens before us, however, ultimately win the
right they seek, the right to be in the United States.

Nor am I aware of any evidence indicating that the
noncitizens seeking to enter, or to remain within, the
United States are more likely than criminal defendants to
threaten the safety of the community if released.  In any
event, this is a matter to be determined, case by case, at
bail hearings.

Which group is more likely to present a risk of flight?

Again, I can find no evidence suggesting that asylum seekers or other noncitizens generally present a greater risk of flight than persons imprisoned for trial where there is probable cause to believe that the confined person has committed a crime. In any event, this matter too is to be determined, case by case, at bail hearings.

If there is no reasonable basis for treating these confined noncitizens worse than ordinary defendants charged with crimes, 18 U. S. C. §3142; worse than convicted criminals appealing their convictions, §3143(b); worse than civilly committed citizens, *supra,* at 10–11; worse than identical noncitizens found elsewhere within the United States, *supra,* at 4; and worse than noncitizens who have committed crimes, served their sentences, and been definitively ordered removed (but lack a country willing to take them), *supra,* at 4, their detention without bail is arbitrary. Thus, the constitutional language, purposes, and tradition that require bail in instances of criminal confinement also very likely require bail in these instances of civil confinement. That perhaps is why Blackstone wrote that the law provides for the possibility of "bail in any case whatsoever." 4 Analysis of the Laws of England, at 148.

C

My examination of the cases from this Court that considered detention of noncitizens and bail suggests that this Court, while sometimes denying bail to individuals, generally has not held that bail proceedings are unnecessary. Indeed, it almost always has suggested the contrary.

1. In 1882 Congress enacted two laws that restricted immigration: The first prohibited the entry of "Chinese laborers." The Chinese Exclusion Act, ch. 126, 22 Stat. 58. The second prohibited the entry of "any convict, lunatic, idiot, or any person unable to take care of himself or herself without becoming a public charge." Act of Aug. 3, 1882, 22 Stat. 214. Neither said a word about bail. But in

one instance, an excluded Chinese woman was detained in jail in San Francisco pending her return to China. She sought bail. *In re Ah Moy*, 21 F. 808 (CC Cal. 1884). Justice Field, sitting as a Circuit Judge, wrote that the court lacked the authority to order bail because doing so would allow her to enter the United States—just what the statute forbade. *Id.,* at 809. The other sitting Circuit Judge (Judge Sawyer) disagreed. *Id.,* at 810 (dissenting opinion). He pointed out that the alien would remain "in the custody and control of the law while lawfully on bail." *Ibid.* He added that it "would be a great hardship, not to say a gross violation of her personal rights," to refuse bail for 15 days before her ship arrived as long as she could provide "security satisfactory to the court" that she would indeed depart when it did. *Id.,* at 809–810. Two other Circuit Judges noted their agreement with Judge Sawyer. *Id.,* at 809, n. 1. But they did not participate in the case, *ibid.*, the two participating judges split 1 to 1, and so the views of presiding Justice Field prevailed. The alien appealed to this Court, *Cheong Ah Moy* v. *United States*, 113 U. S. 216 (1885), but before this Court could decide, the ship departed with Cheong Ah Moy aboard.

2. In *Wong Wing* v. *United States*, 163 U. S. 228 (1896), the Court struck down as unconstitutional a statute that said alien Chinese laborers should be "imprisoned at hard labor" for up to a year before being deported. *Id.,* at 235. In doing so, the Court wrote that although a sentence to hard labor was unlawful, "detention, or temporary confinement," was constitutional, because "[d]etention is a usual feature of every case of arrest on a criminal charge, even when an innocent person is wrongfully accused." *Ibid.* But an analogy to criminal detention is an analogy to instances in which bail hearings are required.

3. In *Tod* v. *Waldman*, 266 U. S. 113 (1924), the Waldman family, like many of the respondents here, challenged their exclusion. They had arrived at Ellis Island fleeing

religious persecution in Ukraine. They were detained because the immigration inspector believed the mother illiterate, one of the daughters disabled, and the whole family likely to become public charges. They appealed to the Labor Department, which ordered Mrs. Waldman retested for literacy, requiring her to read both Yiddish and Hebrew. She could not. She then petitioned for a writ of habeas corpus on the grounds that (1) as a religious refugee she was exempt from the literacy requirement; (2) in any event, she need read only one language, not two; (3) her daughter was not disabled; and (4) the Department of Labor should have allowed her to appeal administratively. *Id.,* at 114–115.

The relevant statutory provisions, just like the present statute, see *infra*, at 20, 29, said that an arriving person, unless "clearly and beyond a doubt entitled" to land, "*shall be detained* for examination . . . by a board of special inquiry." Act of Feb. 5, 1917, §16, 39 Stat. 886 (emphasis added). By the time the case reached this Court, however, the family had been allowed bail. See *Waldman,* 266 U. S., at 117. This Court ordered the Department of Labor to provide the family with an administrative appeal. Then, after initially "remand[ing] the petitioners to the custody of immigration authorities" pending the outcome of the appeal, *id.,* at 120, the Court clarified in a rehearing order that "[n]othing in the order of this Court shall prejudice an application for release on bail of the respondents pending compliance with the mandate of this Court." *Tod* v. *Waldman*, 266 U. S. 547, 548 (1925). This statement is inconsistent with the earlier opinion of Justice Field, sitting as a Circuit Judge, because it shows that even an alien challenging her exclusion could be released on bail. *Supra,* at 14.

4. In *Carlson* v. *Landon*, 342 U. S. 524 (1952), this Court upheld the denial of bail to noncitizen Communists being held pending deportation, despite a statute that permitted

bail proceedings. *Id.,* at 541–546. It did so because it considered the individuals to be a risk to security. It said nothing to suggest that bail proceedings were unnecessary.

5. In *Shaughnessy* v. *United States ex rel. Mezei*, 345 U. S. 206 (1953), the Attorney General had ordered a noncitizen permanently excluded from the United States on the ground that his "entry would be prejudicial to the public interest for security reasons." *Id.*, at 208; see Subversive Activities Control Act of 1950, §§22–23, 64 Stat. 1006–1012. He "sat on Ellis Island because this country shut him out and others were unwilling to take him in." 345 U. S., at 209. After 21 months in confinement he filed a petition for a writ of habeas corpus seeking judicial review of the exclusion decision or release on bail until he could be removed to another country. *Id.,* at 207, 209. This Court refused to review the exclusion decision on the ground that the security matter fell totally within the President's authority, pursuant to an express congressional delegation of power. *Id.,* at 210. The Court also denied Mezei a bail proceeding because in an "exclusion proceeding grounded on danger to the national security . . . neither the rationale nor the statutory authority for" release on bail exists. *Id.,* at 216. It denied bail, however, *after* the Attorney General had already found, on an individualized basis, not only that Mezei was a security risk and consequently not entitled to either admission or bail, but also that he could be denied a hearing on the matter because the basis for that decision could not be disclosed without harm to national security. *Id.,* at 208–209. The respondents in this case have been the subject of no such individualized findings. And unlike Mezei, who was requesting bail after his exclusion proceedings had ended (while the Attorney General searched for a country that would take him—a matter that we again confronted in *Zadvydas*), the respondents here continue to litigate the

lawfulness of their exclusion itself. Thus, Mezei, but not the respondents here, was in a sense in the position of a convicted criminal who had lost his appeal, not a criminal awaiting trial (or the results of an appeal).

6. *Zadvydas* v. *Davis*, 533 U. S. 678 (2001), concerned a noncitizen who had lawfully resided in this country, committed a serious crime, completed his prison sentence, and was then ordered deported. *Id.,* at 684. Zadvydas sought release on bail during the time the Government searched for a country that would take him. *Id.,* at 684–685. The governing statute said an alien such as Zadvydas "may be detained" pending his removal to another country. 8 U. S. C. §1231(a)(6). We interpreted those words as requiring release from detention once it became clear that there was "no significant likelihood of removal in the reasonably foreseeable future"—presumptively after a period of confinement of six months. 533 U. S., at 701. We read the statute as requiring this release because a "statute permitting indefinite detention of an alien would raise a serious constitutional problem." *Id.,* at 690.

From a constitutional perspective, this case follows *a fortiori* from *Zadvydas*. Here only a bail hearing is at issue, not release on bail, much less permanent release. And here there has been no final determination that any of the respondents lacks a legal right to stay in the United States—the bail hearing at issue concerns conditional release pending that final determination. It is immaterial that detention here is not literally indefinite, because while the respondents' removal proceedings must end eventually, they last an indeterminate period of at least six months and a year on average, thereby implicating the same constitutional right against prolonged arbitrary detention that we recognized in *Zadvydas*.

7. In *Demore* v. *Kim*, 538 U. S. 510 (2003), we held that the Government could constitutionally hold without bail noncitizens who had committed certain crimes, had com-

pleted their sentences, and were in removal proceedings. See §1226(c). But we based our holding on the short-term nature of the confinement necessary to complete proceedings. See *id.*, at 529–530. The Court wrote that the "detention at stake . . . lasts roughly a month and a half in the vast majority of cases in which it is invoked, and about five months in the minority of cases in which the alien chooses to appeal." *Id.,* at 530. We added:

> "[I]n 85% of the cases in which aliens are detained [pursuant to the relevant statute], removal proceedings are completed in an average time of 47 days and a median of 30 days. In the remaining 15% of cases, in which the alien appeals the decision of the immigration judge to the Board of Immigration Appeals, appeal takes an average of four months, with a median time that is slightly shorter." *Id.,* at 529 (citation omitted).

Demore himself, an outlier, was detained for six months. *Id.,* at 530–531.

The Court then found detention constitutional "during the limited period" necessary to arrange for removal, and we contrasted that period of detention with the detention at issue in *Zadvydas*, referring to the detention in *Demore* as being "of a much shorter duration." 538 U. S., at 526, 528. JUSTICE KENNEDY stated in a concurrence that the Due Process Clause might require bail hearings "if the continued detention became unreasonable or unjustified." *Id.,* at 532. Dissenting, I wrote that, had I believed that Demore "had conceded that he [was] deportable," then, despite *Zadvydas*, "I would conclude that the Government could detain him without bail for the few weeks ordinarily necessary for formal entry of a removal order." 538 U. S., at 576 (opinion concurring in part and dissenting in part).

The Government now tells us that the statistics it gave to the Court in *Demore* were wrong. Detention normally

lasts twice as long as the Government then said it did. And, as I have pointed out, thousands of people here are held for considerably longer than six months without an opportunity to seek bail. See *supra,* at 3. We deal here with prolonged detention, not the short-term detention at issue in *Demore.* Hence *Demore,* itself a deviation from the history and tradition of bail and alien detention, cannot help the Government.

The upshot is the following: The Constitution's language, its basic purposes, the relevant history, our tradition, and many of the relevant cases point in the same interpretive direction. They tell us that an interpretation of the statute before us that would deny bail proceedings where detention is prolonged would likely mean that the statute violates the Constitution. The interpretive principle that flows from this conclusion is clear and longstanding: "'[A]s between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the Act.'" *Rust* v. *Sullivan,* 500 U. S. 173, 190 (1991) (quoting *Blodgett* v. *Holden,* 275 U. S. 142, 148 (1927) (opinion of Holmes, J.)). Moreover, a "statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional, but also grave doubts upon that score." *Jin Fuey Moy,* 241 U. S., at 401. These legal principles reflect a realistic assumption, namely, that Congress—particularly a Congress that did not consider a constitutional matter—would normally have preferred a constitutional interpretation to an interpretation that may render a statute an unconstitutional nullity. And that is so even where the constitutional interpretation departs from the most natural reading of the statute's language. See *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Constr. Trades Council,* 485 U. S. 568, 575 (1988); see also *National Federation of Independent Business* v. *Sebelius,* 567 U. S. 519, 563, 574–576 (2012)

(majority opinion and opinion of ROBERTS, C. J.).

### III
### *The Statutory Provisions*

The question remains whether it is possible to read the statute as authorizing bail. As desirable as a constitutional interpretation of a statute may be, we cannot read it to say the opposite of what its language states. The word "animal" does not include minerals, no matter how strongly one might wish that it did. Indeed, where "'Congress has made its intent in the statute clear, we must give effect to that intent,'" even if doing so requires us to consider the constitutional question, and even if doing so means that we hold the statute unconstitutional. *Zadvydas*, 533 U. S., at 696 (quoting *Miller* v. *French*, 530 U. S. 327, 336 (2000)). In my view, however, we can, and should, read the relevant statutory provisions to require bail proceedings in instances of prolonged detention without doing violence to the statutory language or to the provisions' basic purposes.

### A
### *Asylum Seekers*

The relevant provision governing the first class of noncitizens, the asylum seekers, is §1225(b)(1)(B)(ii). It says that, if an immigration "officer determines at the time" of an initial interview with an alien seeking to enter the United States "that [the] alien has a credible fear of persecution . . . , the alien *shall be detained* for further consideration of the application for asylum." See Appendix A–1, *infra.* I have emphasized the three key words, namely, "shall be detained." Do those words mean that the asylum seeker *must be detained without bail*?

They do not. *First*, in ordinary English and in light of the history of bail, the word "detain" is ambiguous in respect to the relevant point. The Oxford English Diction-

ary (OED), surveying the history of the word, notes that Edward Hall, a famous 16th-century legal scholar and author of Hall's Chronicle, wrote: "A traytor . . . is apprehended and deteigned in prisone for his offence," a use of the word, as we know from Blackstone, that is consistent with bail. See *supra,* at 8–9; OED (3d ed., Dec. 2012), http://www.oed.com/view/Entry/51176 (annot. to def. 1). David Hume, the famous 18th-century historian and philosopher, writes of being "detained in strict confinement," thereby implying the existence of detention without strict confinement. *Ibid.* A 19th-century novelist writes, "'Beg your pardon, sir,' said the constable, . . . 'I shall be obliged to detain you till this business is settled'"—again a use of "detain" that we know (from Blackstone) is consistent with bail. *Ibid.* And the OED concludes that the primary meaning of "detain" is "[t]o keep in confinement *or under restraint*; to keep prisoner." *Ibid.* (emphasis added). To grant bail, we know, is not to grant unrestrained freedom. Rather, where the Act elsewhere expressly permits bail, it requires "bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General." 8 U. S. C. §1226(a)(2)(A). Similarly in the criminal context, bail imposes numerous restraints, ranging from the provision of a bond, to restrictions on residences and travel, to the imposition of a curfew, to a requirement to obtain medical treatment, to report at regular intervals, or even to return to custody at specified hours. See 18 U. S. C. §3142(c)(1)(B) (listing possible conditions for the pretrial release of federal criminal defendants).

At the very least, because the word "detain" in this context refers to a comparatively long period of time, it can readily coexist with a word such as "bail" that refers to a shorter period of conditional release. For instance, there is nothing inconsistent in saying: During his exile, he was permitted to pay short visits to his home country; during

the period of active hostilities, the soldiers would lay down their arms and fraternize on Christmas Day; during his overseas detention, he was allowed home to see his sick mother; or during his detention pending proceedings, he was permitted bail.

*Second*, our precedent treats the statutory word "detain" as consistent with bail. In *Waldman*, 266 U. S. 547, we considered an immigration statute that stated (in respect to *arriving* aliens) that "[e]very alien who may not appear to the examining inspector at the port of arrival to be clearly and beyond a doubt entitled to land *shall be detained* for examination in relation thereto by a board of special inquiry." Act of Feb. 5, 1917, §16, 39 Stat. 886 (emphasis added). The Court indicated that bail was available, stating that "[n]othing in the order of this court shall prejudice an application for release on bail." 266 U. S., at 548. In so stating, the Court was simply following precedent, such as *Wright* v. *Henkel*, where the Court wrote that bail is available even where not "specifically vested by statute." 190 U. S., at 63; see *supra,* at 11–12. When Congress passed the relevant provisions of the Act in 1996, it legislated against this historical backdrop, at a time when the precise language that it adopted had been interpreted by this Court to permit bail. See *Monessen Southwestern R. Co.* v. *Morgan*, 486 U. S. 330, 338 (1988) ("Congress' failure to disturb a consistent judicial interpretation of a statute may provide some indication that 'Congress at least acquiesces in, and apparently affirms, that [interpretation]'" (quoting *Cannon* v. *University of Chicago*, 441 U. S. 677, 703 (1979))).

*Third*, the Board of Immigration Appeals reads the word "detain" as consistent with bail, for it has held that its regulations, implementing the same statutory provision as is before us, allow bail for asylum seekers who are apprehended inside the United States within 100 miles of the border, rather than at a border crossing. See *In re X-K-*,

23 I. & N. Dec., at 732, 734–735 (discussing 8 CFR §1003.19(h)(2)(i) (2004)). The same statute, same language applies to the detention of those asylum seekers and the ones before us, so the statute must be consistent with bail in the Board of Immigration Appeals' view.

*Fourth*, in *Zadvydas* we found (to avoid similar constitutional questions) that the words "'may be detained'" were consistent with requiring release from long-term detention. 533 U. S., at 682 (quoting 8 U. S. C. §1231(a)(6)). The majority correctly notes that here the language substitutes the word "shall" for the word "may." *Ante,* at 14–16. But the majority is wrong to distinguish *Zadvydas* on this basis. There the Court did not emphasize the word "detain," for the question at issue was release from detention. And the key word was consequently "may," suggesting discretion. Here the question concerns the right to a bail hearing during detention. And the key linguistic ambiguity concerns the word "detention." Is that word consistent with bail proceedings? The answer, for the reasons I have stated, is "yes."

*Fifth*, the statute does not even mention long-term detention without bail. Whether the statute speaks in terms of discretion ("may," as in *Zadvydas*) or mandatory action ("shall," as in this case), the Government's argument is wrong for the same reason: Congress does not unambiguously authorize long-term detention without bail by failing to say when detention must end. As we recognized in *Zadvydas*, Congress anticipated long-term detention elsewhere in the Act, providing for review every six months of terrorist aliens detained under 8 U. S. C. §1537(b)(2)(C), but it did not do so here. See 533 U. S., at 697.

*Sixth*, the Act provides that an asylum applicant whose proceedings last longer than six months may be given work authorization. §1158(d)(2). The majority would apply this provision to some asylum applicants but not the

ones before us. *Ante,* at 26, n. 6. Of course, the statute does not contain that limitation. Read most naturally, the provision offers some indication that Congress, in the same statute, did not require asylum seekers to remain confined without bail at the 6-month mark.

*Seventh*, there is a separate statutory provision that purports to do precisely what the majority says this one does, providing that certain aliens "shall be detained . . . *until removed.*" §1225(b)(1)(B)(iii)(IV) (emphasis added); *ante*, at 16 (detention must continue until proceedings "have finished"). The problem for the majority is that this other provision applies only to those who, unlike the respondents, have no credible fear of persecution. The provision that applies here lacks similar language.

Linguistic ambiguity, while necessary, is not sufficient. I would also ask whether the statute's purposes suggest a congressional refusal to permit bail where confinement is prolonged. The answer is "no." There is nothing in the statute or in the legislative history that reveals any such congressional intent. The most likely reason for its absence is that Congress, like the Government when it appeared before us in *Demore*, believed there were no such instances, or at least that there were very few. Indeed, the Act suggests that asylum proceedings ordinarily finish quickly. See §1158(d)(5)(A) (providing that absent "exceptional circumstances," final administrative adjudication (not including appeal) must be completed "within 180 days," and any appeal must be filed "within 30 days" of the decision). And for those proceedings that last longer than six months, we know that two-thirds of asylum seekers win their cases. Thus, legislative silence suggests not disapproval of bail, but a lack of consideration of the matter. For present purposes that is sufficient. It means that Congress did not intend to forbid bail. An interpretation that permits bail—based upon history, tradition, statutory context, and precedent—is consistent, not inconsistent,

with what Congress intended the statutory provision to do.

The majority apparently finds a contrary purpose in the fact that other provisions of the statute permit the Attorney General to release an alien on parole "'for urgent humanitarian reasons or significant public benefit'" and impose bail-like conditions. *Ante,* at 16–17 (discussing 8 U. S. C. §1182(d)(5)(A)). Yet under the majority's interpretation of "detain," the same argument could have been made in *Zadvydas.* We held that noncitizens presumptively are entitled to release after six months of detention, notwithstanding an available alternative avenue for relief, namely, bail. 533 U. S., at 683. There is no reason to reach a different result here. While the Government historically used this provision to take account of traditional bail factors (flight risk, safety risk), the President since issued an Executive Order directing parole to be granted "in all circumstances only when an individual demonstrates urgent humanitarian reasons or a significant public benefit." Exec. Order. No. 13767, 82 Fed. Reg. 8793 (2017). And besides, Congress' provision of parole to permit, for example, release for the purpose of medical care or to testify in a court proceeding—which *adds to* the circumstances under which a noncitizen can be released from confinement—says nothing about whether Congress intended to *cut back on* those circumstances in respect to the meaning of "detain" and the historical understanding that detention permits bail.

## B

### *Criminals Who Have Served Their Sentences*

The relevant statutory provision, §1226(c), says in paragraph (1) that the "Attorney General shall *take into custody* any alien who . . . is deportable [or inadmissible] by reason of having committed [certain crimes] when the alien is released," presumably (or ordinarily) after having

served his sentence. It then goes on to say, in paragraph (2), that the "Attorney General *may release [that] alien . . . only if* the Attorney General decides pursuant to section 3521 of title 18 that release of the alien from custody is necessary to provide protection to a witness [or to certain related others]." See Appendix A–2, *infra.*

I have emphasized the relevant phrases: "take into custody" in the first paragraph, and "may release [that] alien . . . only if" in the second paragraph. We have long interpreted "in custody" as "not requir[ing] that a prisoner be physically confined." *Maleng* v. *Cook*, 490 U. S. 488, 491 (1989) (*per curiam*). In the habeas context, we have held that "a person released on bail or on his own recognizance" is "'in custody' within the meaning of the statute." *Hensley* v. *Municipal Court, San Jose-Milpitas Judicial Dist.*, *Santa Clara Cty.*, 411 U. S. 345, 349 (1973); *Justices of Boston Municipal Court* v. *Lydon*, 466 U. S. 294, 300–301 (1984) (same). The reason is simple, as I already have explained, *supra,* at 21: A person who is released on bail "is subject to restraints 'not shared by the public generally.'" *Hensley*, *supra*, at 351 (quoting *Jones* v. *Cunningham*, 371 U. S. 236, 240 (1963)); see also *Maleng*, *supra,* at 491 ("[A] prisoner who had been placed on parole was still 'in custody'" because his "release from physical confinement . . . was not unconditional; instead, it was explicitly conditioned on his reporting regularly to his parole officer, remaining in a particular community, residence, and job, and refraining from certain activities" (citing *Jones*, *supra*, at 242)).

Moreover, there is no reason to interpret "custody" differently than "detain." The OED defines "custody" as "[t]he state of being detained," http://www.oed.com/view/ Entry/46305 (def. 5). "Detained," as I have previously pointed out, can be read consistently with bail. See *supra,* at 20–23. The OED also defines the statutory phrase, "take (a person) into custody," as "to arrest and imprison

(a person)," http://www.oed.com/view/Entry/46305 (def. 5).
And we know from the history, tradition, case law, and
other sources earlier discussed, including Blackstone, that
arresting and imprisoning a person is consistent with a
bail hearing and a subsequent grant of bail, even where a
statute contains words such as "commitment" or "detain."
See *supra,* at 5–19 (citing, *e.g., Wright,* 190 U. S., at 62
(reading as consistent with a bail proceeding the statutory
language "'shall issue [a] warrant for the commitment . . .
to the proper jail, there to remain'" until "'surrender'" for
extradition)).

But what about the second phrase, stating that the
Attorney General "may release [that] alien . . . *only if* the
Attorney General decides pursuant to section 3521 of title
18 that release of the alien from custody is necessary to
provide protection to a witness"? Does the presence of the
words "only if" show that the statute automatically denies
bail for any other reason?

It does not. That is because the phrase has nothing to
do with bail. It has to do with a special program, the
Witness Protection Program, set forth in 18 U. S. C.
§3521. That program allows the Attorney General to
relocate the witness, to give him an entirely new identity,
to help his family similarly, and to pay him a stipend,
among other things. §§3521(a)(1), (b)(1). The Attorney
General may "take such action as [he] determines to be
necessary to protect the person," presumably even free the
witness from whatever obligations might require him to
report to an immigration or judicial authority.
§3521(b)(1). Accordingly, when the Attorney General
"release[s]" an alien under 8 U. S. C. §1226(c)(2), he does
not grant bail; he may well do far more, freeing the wit-
ness from a host of obligations and restraints, including
those many obligations and restraints that accompany
bail. See *supra,* at 21.

This understanding of "release" in §1226(c) is consistent

with the OED's definition of "release" as "to free from restraint" or even "to liberate from . . . an obligation" (not simply "to free from . . . captivity"), http://www.oed.com/view/Entry/161859 (def. 6(a)). And it is consistent with our earlier reading of the word "detain." *Supra,* at 20–24. Following the OED's definition of "detain" as "*under restraint*," we have understood the word "detention" to include the state of being "under" those "restraints" that typically accompany bail. *Supra,* at 20–24. That is to say, both the individual on bail and the individual not on bail are "detained"; and the Attorney General, through his Witness Protection Program powers can free the individual from both. To repeat: The provision at issue means that the Attorney General "may release" the detained person from the restraints that accompany detainment—whether that individual has been detained with, or without, bail.

So understood the phrase has nothing to do with the issue before us: whether a confined individual is, or is not, entitled to bail or a bail hearing. It simply means that the Attorney General cannot free that person from all, or most, restraining conditions (including those that accompany bail) unless the alien is placed in the Witness Protection Program. So read, the words "only if" neither favor nor disfavor a reading of the statute consistent with the right to a bail proceeding.

The purpose-related reasons that argue for a bail-favorable reading are also applicable here. Congress did not consider the problem of long-term detention. It wrote the statute with brief detention in mind. See H. R. Rep. No. 104–469, pt. 1, p. 123, and n. 25 (1996) (stating that the "average stay [was] 28 days"). Congress did not know (for apparently the Government did not know in *Demore*) that the average length of detention for this class would turn out to be about a year. Nor did Congress necessarily know that about 40% of class members eventually obtain the right to remain in the United States.

I should add that reading the statute as denying bail to those whose detention is prolonged is anomalous. Those whose removal is legally or factually questionable could be imprisoned indefinitely while the matter is being decided. Those whose removal is not questionable (for they are under a final removal order) could be further imprisoned for no more than six months. See *supra*, at 4, 17. In fact, even before our decision in *Zadvydas*, the Government gave bail hearings to noncitizens under a final order of removal after six months of detention. See 533 U. S., at 683.

## C

### *Other Applicants for Admission*

The statutory provision that governs the third category of noncitizens seeking admission at the border is §1225(b)(2)(A). It says that "if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title." See Appendix A–3, *infra*.

The Government tells us that this miscellaneous category consists of persons who are neither (1) clearly eligible for admission, nor (2) clearly ineligible. Pet. for Cert. 3–4. A clearly eligible person is, of course, immediately admitted. A clearly ineligible person—someone who lacks the required documents, or provides fraudulent ones—is "removed . . . without further hearing or review." §1225(b)(1)(A)(i); see §§1182(a)(6)(C), (a)(7). But where the matter is not clear, *i.e.*, where the immigration officer determines that an alien "is not clearly and beyond a doubt entitled to be admitted," he is detained for a removal proceeding. §1225(b)(2)(A). Like all respondents, this class has been detained for at least six months. It may include persons returning to the United States who have work permits or other documents seemingly entitling

them to entry, but whom an immigration officer suspects
are inadmissible for some other reason, such as because
they may have incomplete vaccinations or have committed
student visa abuse or a crime of "moral turpitude." See
§1182(a) (delineating classes of aliens ineligible for admis-
sion). For instance, the Federal Register is replete with
examples of offenses that immigration authorities have
thought are crimes of moral turpitude but that the courts
of appeals later determine are not. See, *e.g., Goldeshtein*
v. *INS*, 8 F. 3d 645, 648 (CA9 1993) (structuring financial
transactions to avoid currency reports); *Nunez* v. *Holder*,
594 F. 3d 1124, 1138 (CA9 2010) (indecent exposure). It
also may include individuals who claim citizenship by
virtue of birth or parentage but who lack documents
clearly proving their claim.

The critical statutory words are the same as those I
have just discussed in the context of the asylum seekers—
"shall be detained." There is no more plausible reason
here than there was there to believe those words foreclose
bail. See *supra*, at 20–24. The constitutional considera-
tions, the statutory language, and the purposes underlying
the statute are virtually the same. Thus, the result should
be the same: Given the constitutional considerations, we
should interpret the statute as permitting bail.

## IV

The majority concludes in Part V, *ante,* at 29–31, by
saying that, before considering bail-related constitutional
arguments, the lower courts "should reexamine whether
respondents can continue litigating their claims as a
class." *Ante,* at 29. Relying on dicta in *Reno* v. *American-
Arab Anti-Discrimination Comm.,* 525 U. S. 471 (1999)
(*AADC*), it then suggests that the respondents may not be
able to continue litigating because the Act says that

> "no court (other than the Supreme Court) shall have
> jurisdiction or authority to enjoin or restrain the oper-

ation [of the statutory provisions here at issue] other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." 8 U. S. C. §1252(f)(1).

Were the majority's suggestion correct as to this jurisdictional question, it would have shown, at most, that we should decide the constitutional question here and now. We have already asked for and received briefs on that question. But I do not believe the majority is correct. Every member of the classes before us falls within the provision's exception. Every one of them is an "individual alien against whom proceedings under such part have been initiated." *Ibid.* The Court in *AADC* did not consider, and had no reason to consider, the application of §1252(f)(1) to such a class. Regardless, a court could order declaratory relief. Federal Rule of Civil Procedure 23(b)(2) permits a class action where "final injunctive relief or *corresponding* declaratory relief is appropriate respecting the class as a whole." (Emphasis added.) And the Advisory Committee says that declaratory relief can fall within the Rule's term "corresponding" if it "serves as a basis for later injunctive relief." Notes on Rule 23(b)(2)–1966 Amendment, 28 U. S. C. App., p. 812.

Jurisdiction also is unaffected by 8 U. S. C. §1252(b)(9), which by its terms applies only "[w]ith respect to review of an order of removal under [§1252(a)(1)]." §1252(b). Respondents challenge their detention without bail, not an order of removal.

Neither does *Wal-Mart Stores, Inc.* v. *Dukes*, 564 U. S. 338 (2011), bar these class actions. Every member of each class seeks the same relief (a bail hearing), every member has been denied that relief, and the differences in situation among members of the class are not relevant to their entitlement to a bail hearing.

At a minimum I can find nothing in the statute or in the cases to which the majority refers that would prevent the respondents from pursuing their action, obtaining a declaratory judgment, and then using that judgment to obtain relief, namely, a bail hearing, in an individual case. Thus, I believe the lower courts are free to consider the constitutionality of the relevant statutory provisions as the majority now interprets them.

## V

### *Conclusion*

The relevant constitutional language, purposes, history, traditions, context, and case law, taken together, make it likely that, where confinement of the noncitizens before us is prolonged (presumptively longer than six months), bail proceedings are constitutionally required. Given this serious constitutional problem, I would interpret the statutory provisions before us as authorizing bail. Their language permits that reading, it furthers their basic purposes, and it is consistent with the history, tradition, and constitutional values associated with bail proceedings. I believe that those bail proceedings should take place in accordance with customary rules of procedure and burdens of proof rather than the special rules that the Ninth Circuit imposed.

The bail questions before us are technical but at heart they are simple. We need only recall the words of the Declaration of Independence, in particular its insistence that *all* men and women have "certain unalienable Rights," and that among them is the right to "Liberty." We need merely remember that the Constitution's Due Process Clause protects each person's liberty from arbitrary deprivation. And we need just keep in mind the fact that, since Blackstone's time and long before, liberty has included the right of a confined person to seek release on bail. It is neither technical nor unusually difficult to read

BREYER, J., dissenting

the words of these statutes as consistent with this basic right. I would find it far more difficult, indeed, I would find it alarming, to believe that Congress wrote these statutory words in order to put thousands of individuals at risk of lengthy confinement all within the United States but all without hope of bail. I would read the statutory words as consistent with, indeed as requiring protection of, the basic right to seek bail.

Because the majority does not do so, with respect, I dissent.

APPENDIXES
A
1

*Statute Applicable to Asylum Seekers*

8 U. S. C. §1225. "Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing

.          .          .          .

"(b) Inspection of applicants for admission

"(1) Inspection of aliens arriving in the United States and certain other aliens who have not been admitted or paroled

"(A) Screening

"(i) In general

"If an immigration officer determines that an alien (other than an alien described in subparagraph (F)) who is arriving in the United States or is described in clause (iii) is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title, the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution.

"(ii) Claims for asylum

"If an immigration officer determines that an alien (other than an alien described in subparagraph (F)) who is arriving in the United States or is described in clause (iii) is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title and the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution, the officer shall refer the alien for an interview by an asylum officer under subparagraph (B).

.          .          .          .

"(B) Asylum interviews

"(i) Conduct by asylum officers

"An asylum officer shall conduct interviews of aliens referred under subparagraph (A)(ii), either at a port of entry or at such other place designated by the Attorney General.

"(ii) Referral of certain aliens

"If the officer determines at the time of the interview that an alien has a credible fear of persecution (within the meaning of clause (v)), the alien *shall be detained for further consideration of the application for asylum.*"  (Emphasis added.)

2

*Statute Applicable to Criminal Aliens*

8 U. S. C. §1226.  "Apprehension and detention of aliens

"(a) Arrest, detention, and release
  "On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) of this section and pending such decision, the Attorney General—
  "(1) may continue to detain the arrested alien; and
  "(2) may release the alien on—
  "(A) *bond* of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or
  "(B) conditional parole;

.        .        .        .        .

"(c) Detention of criminal aliens
  "(1) Custody
  "The Attorney General *shall take into custody* any alien who—
  "(A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,
  "(B) is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,
  "(C) is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence[d] to a term of imprisonment of at least 1 year, or
  "(D) is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,
"when the alien is released, without regard to whether the alien is released on parole, supervised release, or pro-

bation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

"(2) Release

"The Attorney General *may release* an alien described in paragraph (1) *only if* the Attorney General decides *pursuant to section 3521* of title 18 that release of the alien from custody is necessary to provide protection to a witness, a potential witness, a person cooperating with an investigation into major criminal activity, or an immediate family member or close associate of a witness, potential witness, or person cooperating with such an investigation, and the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding. A decision relating to such release shall take place in accordance with a procedure that considers the severity of the offense committed by the alien." (Emphasis added.)

3

*Statute Applicable to Miscellaneous Applicants for Admission*

8 U. S. C. §1225. "Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing

.          .          .          .          .

"(b) Inspection of applicants for admission

.          .          .          .          .

"(2) Inspection of other aliens

"(A) In general

"Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien *shall be detained* for a proceeding under section 1229a of this title.

"(B) Exception

"Subparagraph (A) shall not apply to an alien—

"(i) who is a crewman,

"(ii) to whom paragraph (1) applies, or

"(iii) who is a stowaway.

"(C) Treatment of aliens arriving from contiguous territory

"In the case of an alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of this title."  (Emphasis added.)

B

*State Bail Law*

| State | Key Bail Provisions |
|---|---|
| Alabama | Ala. Const., Art. 1, §16; Ala. Code §§15–13–3, 15–13–108, 15–13–190 (2011); Ala. Rule Crim. Proc. 7.2 (Cum. Supp. 2017) |
| Alaska | Alaska Const., Art. 1, §11; Alaska Stat. §§12.30.011, 12.30.040 (2016) |
| Arizona | Ariz. Const., Art. 2, §22; Ariz. Rev. Stat. Ann. §§13–3961 (Cum. Supp. 2017), 13–3961.01 (2010), 13–3962; Ariz. Rule Crim. Proc. 7.2 (Cum. Supp. 2017) |
| Arkansas | Ark. Const., Art. 2, §8; Ark. Code §§16–84–110 (2005), 16–91–110 (Supp. 2017); Ark. Rule App. Crim. Proc. 6 (2017) |
| California | Cal. Const., Art. 1, §12; Cal. Penal Code Ann. §1271 (West 2004) |
| Colorado | Colo. Const., Art. 2, §19; Colo. Rev. Stat. §§16–4–101, 16–4–102, 16–4–201, 16–4–201.5 (2017) |
| Connecticut | Conn. Const., Art. 1, §8; Conn. Gen. Stat. §§54–63f, 54–64a (2017) |
| Delaware | Del. Const., Art. 1, §12; Del. Code Ann., Tit. 11, §§2103, 2104, 2112 (2015) |
| Florida | Fla. Const., Art. 1, §14; Fla. Stat. §§903.046, 903.132, 903.133 (2017) |
| Georgia | Ga. Code Ann. §§17–6–1, 17–6–15 (Supp. 2017) |

Appendix B to opinion of BREYER, J.

| State | Key Bail Provisions |
|---|---|
| Hawaii | Haw. Rev. Stat. §§804–3, 804–4 (2014) |
| Idaho | Idaho Const., Art. 1, §6; Idaho Code Ann. §19–2903 (2017) |
| Illinois | Ill. Const., Art. 1, §9; Ill. Comp. Stat., ch. 725, §§5110–4, 5110–6.2 (West 2016) |
| Indiana | Ind. Const., Art. 1, §17; Ann. Ind. Code §§35–33–8.5–6 (West 2012), 35–33–9–1 (West Cum. Supp. 2017) |
| Iowa | Iowa Const., Art. 1, §12; Iowa Code Ann. §§811.1, 811.5 (West 2015) |
| Kansas | Kan. Const., Bill of Rights §9; Kan. Stat. Ann. §§22–2801, 22–2804 (2007), 22–2802 (2016 Cum. Supp.) |
| Kentucky | Ky. Const., §16; Ky. Rev. Stat. Ann. §431.066 (West Cum. Supp. 2017); Ky. Rules Crim. Proc. 4.02, 4.54, 12.78 (West Cum. Supp. 2017) |
| Louisiana | La. Const., Art. 1, §18; La. Code Crim. Proc. Ann., Art. 312, 316 (West 2017) |
| Maine | Me. Const., Art. 1, §10; Me. Rev. Stat. Ann., Tit. 15, §§1003, 1051 (Cum. Supp. 2017), 1026, 1027 (2016) |
| Maryland | Md. Crim. Proc. Code Ann. §§5–101, 5–102 (Supp. 2017), 5–207 (2008); Md. Rules 4–216.1, 4–349 (2018) |
| Massachusetts | Mass. Gen. Laws, ch. 276, §§20D, 42, 42A (2016); Mass. Rule Crim. Proc. 31 (West 2017) |

Appendix B to opinion of BREYER, J.

| State | Key Bail Provisions |
| --- | --- |
| Michigan | Mich. Comp. Laws Ann. §§765.6 (West Supp. 2017), 770.9 (West 2006) |
| Minnesota | Minn. Const., Art. 1, §7; Minn. Stat. §629.16 (2016); Minn. Rules Crim. Proc. 6, 28.02 (2016) |
| Mississippi | Miss. Const., Art. 32, §29; Miss. Code Ann. §§99–5–11, 99–35–3. (2015) |
| Missouri | Mo. Const., Art. 1, §§20, 34; Mo. Ann. Rev. Stat. §§544.455, 544. 671 (Vernon Cum. Supp. 2017), 544.457, 547.170 (Vernon 2002) |
| Montana | Mont. Const., Art. 2, §21; Mont. Code Ann. §§46–9–102, 46–9–107 (2017) |
| Nebraska | Neb. Const., Art. 1, §9; Neb. Rev. Stat. §§29–901 (2017 Supp.), 29–2301 (2016) |
| Nevada | Nev. Const., Art. 1, §7; Nev. Rev. Stat. §§178.484, 178.488 (2015) |
| New Hampshire | N. H. Rev. Stat. Ann. §§597:1 (2001), 597:1–a (Cum. Supp. 2017), 597:1–c, 597:2 |
| New Jersey | N. J. Const., Art. 1, §11; N. J. Stat. Ann. §§2A:162–11 (West 2011), 162–18 (West Cum. Supp. 2017), 2A:162–20; N. J. Rule App. Proc. 2:9–4 (West 2018) |
| New Mexico | N. M. Const., Art. 2, §13; N. M. Dist. Ct. Rules Crim. Proc. 5–401, 5–402 (1992) |

Appendix B to opinion of BREYER, J.

| State | Key Bail Provisions |
|---|---|
| New York | N. Y. Crim. Proc. Law Ann. §§510.20, 530.10 (West 2009), 510.30 (West Cum. Supp. 2018) |
| North Carolina | N. C. Gen. Stat. Ann. §§15A–533, 15A–534 (2017) |
| North Dakota | N. D. Const., Art. 1, §11; N. D. Rule Crim. Proc. 46 (2016–2017) |
| Ohio | Ohio Const., Art. I, §9; Ohio Rev. Code Ann. §§2937.222, 2949.02 (Lexis 2014); Ohio Rule Crim. Proc. 46 (Lexis 2017–2018) |
| Oklahoma | Okla. Const., Art. 2, §8; Okla. Stat., Tit. 22, §§1077, 1101, 1102 (2011) |
| Oregon | Ore. Const., Art. 1, §§14, 43; Ore. Rev. Stat. §§135.240, 138.650 (2015) |
| Pennsylvania | Pa. Const., Art. 1, §14; 42 Pa. Cons. Stat. §5701 (2015); Pa. Rule Crim. Proc. 521 (West 2017) |
| Rhode Island | R. I. Const., Art. 1, §9; R. I. Gen. Laws §§12–13–1, 12–22–12 (2002); R. I. Super. Ct. Rule Crim. Proc. 46 (Supp. 2017) |
| South Carolina | S. C. Const., Art. 1, §15; S. C. Code Ann. §§17–15–10, 22–5–510 (Cum. Supp. 2017), 18–1–90 (2014) |
| South Dakota | S. D. Const., Art. 6, §8; S. D. Codified Laws §§23A–43–2, 23A–43–2.1, 23A–43–16 (2016), 23A–43–3, 23A–43–4 (Cum. Supp. 2017) |
| Tennessee | Tenn. Const., Art. 1, §15; Tenn. Code Ann. §§40–11–102, 40–11–105, 40–11–113 (2012) |

Appendix B to opinion of BREYER, J.

| State | Key Bail Provisions |
| --- | --- |
| Texas | Tex. Const., Art. 1, §§11, 11a, 11b, 11c; Tex. Code Crim. Proc. Ann., Art. 17.15, 17.40 (Vernon 2015), 44.04 (Vernon Cum. Supp. 2017) |
| Utah | Utah Const., Art. 1, §8; Utah Code §§77–20–1, 77–20–10 (2017) |
| Vermont | Vt. Const., ch. 2, §40; Vt. Stat. Ann., Tit. 13, §§7553, 7574 (2009), 7553a, 7554 (2017 Cum. Supp.) |
| Virginia | Va. Code Ann. §§19.2–120, 19.2–120.1, 19.2–121, 19.2–319 (2015) |
| Washington | Wash. Const., Art. 1, §20; Wash. Rev. Code §§10.21.020, 10.21.030, 10.21.040, 10.73.040 (2016) |
| West Virginia | W. Va. Code Ann. 62–1C–1 (Lexis 2014) |
| Wisconsin | Wis. Const., Art. 1, §8, cl. 2; Wis. Stat. §§969.01, 969.03, 969.035 (2011–2012) |
| Wyoming | Wyo. Const., Art. 1, §14; Wyo. Stat. Ann. §7–10–101 (2015) |